221 N.J. Super. 586 (1987)
535 A.2d 531
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM RICHARD COBURN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1987.
Decided December 23, 1987.
*588 Before Judges J.H. COLEMAN, O'BRIEN and HAVEY.
Charles M. Moriarty, argued the cause for appellant (Falvo, Bonello, Moriarty & Steiger, attorneys).
Linda K. Calloway, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by COLEMAN, J.H., P.J.A.D.
*589 The significant question raised in this appeal is whether Miranda[1] warnings are required when a suspect who has not been arrested is questioned by a police officer at a location reported to the police as the scene of a killing. The trial judge held that Miranda warnings are not required. We agree and affirm.
A Monmouth County Grand Jury indicted defendant for the murder of Madga Lewis,[2] a/k/a Maria Lewis, contrary to N.J.S.A. 2C:11-3 (Count One); second degree possession of a handgun for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (Count Two); third degree possession of a handgun without a permit, contrary to N.J.S.A. 2C:39-5b (Count Three); possession of over 25 grams of marijuana and possession with intent to distribute marijuana, contrary to N.J.S.A. 24:21-19a(1) (Count Four) and N.J.S.A. 24:21-20a(4) (Count Five); and unlawful possession of a knife, contrary to N.J.S.A. 2C:39-5d (Count Six).
Defendant filed motions to suppress the use of the gun, marijuana and his oral statements as evidence. These motions were denied. At the conclusion of a jury trial, defendant was found guilty on all counts except unlawful possession of a knife. After merging Count Two with Count One, defendant was sentenced to a custodial term of life with 30 years of parole ineligibility for the murder. Under Count Three defendant was sentenced to a concurrent term of nine months. After merging Count Five with Count Four, defendant was sentenced on Count Four to a concurrent term of six years. A total penalty of $1,025 was assessed payable to the Violent Crimes Compensation *590 Board. Defendant has appealed. We now affirm except as to the sentence on Count Three.
In this appeal, defendant contends that:
POINT I
THE COURT ERRED BY PERMITTING DEFENDANTS STATEMENTS TO BE ADMITTED INTO EVIDENCE.
1. THE DEFENDANT'S INTERROGATION SHOULD HAVE BEEN SUPPRESSED UNDER MIRANDA.

A. PRE-MIRANDA STATEMENTS SHOULD HAVE BEEN SUPPRESSED.
B. IT IS PLAIN ERROR TO ALLOW DEFENDANTS POST-MIRANDA WARNING STATEMENTS INTO EVIDENCE SINCE HE WAS INCAPABLE OF MAKING A KNOWLEDGEABLE WAIVER.
2. DEFENDANT'S INTERROGATION DOES NOT FIT UNDER THE "PUBLIC SAFETY EXCEPTION" OF NEW YORK v. QUARLES.

3. THE RULE OF LAW ENUNCIATED IN NEW YORK v. QUARLES SHOULD NOT BE FOLLOWED BY NEW JERSEY COURTS.
POINT II
THE TRIAL COURT ERRED BY ALLOWING THE MARIJUANA FOUND UNDERNEATH DEFENDANT'S BED TO BE INTRODUCED INTO EVIDENCE.
1. MRS. POLHEMUS' CONSENT WAS IMMATERIAL SINCE SHE LACKED AUTHORITY TO GIVE CONSENT.
2. MRS. POLHEMUS' CONSENT WAS NOT GIVEN VOLUNTARILY.
3. THE RECORD DOES NOT CLEARLY SHOW THAT MRS. POLHEMUS GAVE CONSENT.
POINT III
IT WAS PLAIN ERROR TO ALLOW THE MEDICAL EXAMINER TO TESTIFY ABOUT GUN DISTANCES.
A. THERE WAS NO SHOWING THAT THE MEDICAL EXAMINER WAS QUALIFIED TO TESTIFY ON GUN DISTANCES FROM INFLICTED WOUNDS.
B. THE MEDICAL EXAMINER'S TESTIMONY CONCERNING FIRING DISTANCES SHOULD NOT HAVE BEEN ALLOWED SINCE IT FELL OUTSIDE THE SCOPE OF DISCOVERY.
POINT IV
THE TRIAL JUDGE ABUSED HIS DISCRETION BY PERMITTING THE STATE TO INTRODUCE PHOTOGRAPHS OF THE DECEASED'S BODY.
POINT V
THE TRIAL JUDGE ERRED BY NOT PERMITTING DEFENDANT TO INTRODUCE RELEVANT PHOTOGRAPHIC EVIDENCE.
POINT VI
THE PROSECUTOR COMMITTED PLAIN ERROR WHEN HE DEMONSTRATED THE GUN BEFORE THE JURY AND TOLD THEM THAT IT *591 COULD NOT BE FIRED A SECOND TIME WITHOUT MANUALLY COCKING IT.
POINT VII
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION FOR A NEW TRIAL.
The victim, who was defendant's girlfriend, was murdered on December 29, 1984. Defendant shot her in his van. The gunshots were heard by Peter Rice as he waited in his automobile for the victim to return from defendant's van. After the shooting, defendant went to the home of his former wife, Joyce Coburn. Defendant told Joyce he had killed his girlfriend with a gun which was in his van. Joyce called Carole Stavola, one of defendant's sisters, to ask her to come over. Stavola and her friend, Claire Tyluki, went to Joyce's home. Joyce then drove her son to her parent's home which was about five minutes away. Upon arrival, she told her parents what the defendant had confided to her. Unbeknownst to Joyce her father called the Ocean Township Police Department. He reported to the police that someone had been killed at his daughter's home at 18 Brown Place.
In response to the phone call Ocean Township Patrolman Neil Ingenito was dispatched to 18 Brown Place. He testified at the Miranda hearing that upon his arrival he observed a van in the driveway and thereupon entered the home through the kitchen door. A male, later identified as defendant, was sitting at the kitchen table with Claire Tyluki; Carole Stavola was standing nearby. Twice the patrolman asked "what happened" but there was no response. He got the impression that those in the room did not know what he was talking about or why he was there. Officer Ingenito telephoned headquarters for supplemental instructions. Patrolman Thompson advised Ingenito to speak to or locate an individual named "Coburn" because that person had told his ex-wife, "I just killed my girlfriend, now, I'm going to kill ."
Ingenito then asked the only male in the room if he was Coburn and defendant said yes. Ingenito described his questioning of defendant as follows:

*592 After I got off the phone with Patrolman Thompson, I asked Mr. Coburn if he had been talking to his ex-wife and he said yes. I then asked him, "Did you tell your ex-wife that you just killed your girlfriend." And his response was, "I did it." And I said, "You did what, you talked to your wife or killed your ex  talked to your ex-wife and killed your girlfriend?" He said, "I killed my girlfriend."
Ingenito then asked defendant "Where did this happen?" Defendant said that he did not remember. Ingenito asked defendant where was the gun and defendant said it was in the van. The officer testified that he asked where was the gun just to make sure it was not within the reach of defendant. Ingenito further testified that defendant made a statement that was not in response to a question. Defendant said that "he was going to take his kids to the movies that day but he decided to go over his girlfriend's house and they had an argument and he shot her and he said when he shot her she fell into the well of his van."
A .22 caliber gun containing two spent shells was seized from inside the van in a brown leather holster. Blood stains were observed inside the van. The body was not found in the van because defendant disposed of it in a wooded area. Defendant was then arrested and taken to police headquarters. At the police station defendant was given Miranda warnings which he said he understood. During the questioning that ensued, defendant was visibly upset, but gave responsive, coherent answers to many questions. He informed the officers that his girlfriend's name was "Maria," that she lived in the Asbury Park projects, building 5, apartment 2, that she was Puerto Rican, and that "I know she's dead because I killed her." He said they were sitting in the van in the parking lot at her residence when he shot her. Based on defendant's statement and his description of the route he had taken to dispose of her body by dragging it into the woods, the officers called the Tinton Falls Police Department to assist in locating the body. The body was found in a wooded area near a reclamation center. An autopsy revealed that the victim died from two *593 gunshot wounds caused by bullets fired from the gun removed from defendant's van.
Meanwhile, Joyce Coburn's father, Rudolph Wunch, telephoned the police station a second time with additional information concerning marijuana at the home of defendant's sister, Helen Pohlemus, with whom defendant resided. Detective Miller advised Pohlemus, who was at the police station, that the police were informed there was a large quantity of marijuana under defendant's bed in her home. The detective told Pohlemus that the police wanted to retrieve the marijuana and that she had the right to refuse. Mrs. Pohlemus consented to admit the officers into her home to seize the marijuana. Patrolman Glenn Harrington accompanied Mrs. Pohlemus to her home, where she took him directly to defendant's bedroom. The officer looked under the bed and pulled out a brown grocery bag near the foot of the bed. The bag contained 150 clear plastic bags of a substance subsequently determined by laboratory analysis to be 201.6 grams of marijuana.
Defendant testified on his own behalf at trial. His version of events which led up to the shooting was substantially different from that offered by the State. As to the killing, defendant testified that he went to the victim's apartment on December 29, 1984, because he wanted to get rid of the marijuana seized from under his bed before his sister found it. He said the marijuana belonged to Lewis. He spoke to the victim's roommate who told him Lewis was not home. He then asked the roommate to go with him to the movies. The roommate agreed and told him to come back in an hour to allow her time to get ready. While sitting in his van trying to decide whether to go home and change his clothes, he saw Lewis walk out of the building with Peter Rice. He talked with Lewis for a few minutes in his van. Lewis then exited the van, walked over to Rice where she remained for five or ten minutes and returned in a "completely different" mood. He said Lewis was angry and told him she did not need this "mess" and he could take back all his money and gifts.
*594 According to defendant, Lewis threatened to kill him because he asked her roommate to go to the movies. After she threatened him, he threatened to dispose of the marijuana by throwing it in the garbage. At that point he turned away from Lewis. As he turned towards Lewis again, she was holding his gun in her hands. Defendant grabbed for the gun and it went off. Lewis screamed, "You fucking bastard." He pushed her and "boom, it went off again." Defendant grabbed the gun and immediately sped off to Jersey Shore Hospital. When he arrived at the hospital he realized Lewis was dead. He was unsure what to do next. Defendant stated that he decided to dispose of the body by dragging it from the van and leaving it in a wooded area. He said that he then went to his ex-wife's home, told her "my girlfriend's been shot" and asked her to summon the police. When the police officers arrived, he said that he told the officers that he shot his girlfriend and gave them permission to look in the van.
Defendant admitted that before the gun would fire, one had to both cock the gun to rotate the chamber and pull the trigger. The same action was required before each firing. He insisted, however, that he did not observe Lewis cock the gun or remember hearing the sound of a rotating chamber. Laboratory evidence presented at the trial indicated that four and one-half pounds of pressure had to be applied to the trigger to make the gun fire.
Defendant argues in this appeal that his pre-Miranda statements should have been suppressed because they were given in response to custodial interrogation. Officer Ingenito testified at the Miranda hearing that he questioned defendant to find out what, if anything, had occurred. He said defendant was not a target of any investigation because there was nothing yet corroborating the phone call to police headquarters. He wanted to find out if defendant had made the statement and then find out whether it was true. The trial judge held that the pre-Miranda statements were admissible under State v. Gosser, 50 N.J. 438 (1967), cert. den. 390 U.S. 1035, 88 S.Ct. 1434, *595 20 L.Ed.2d 295 (1968) because the police were conducting on the scene questioning as to facts surrounding a potential crime. He also found that defendant's statement regarding the movies was admissible on the ground that it was volunteered and was not in response to questions.
We reject defendant's contention that his pre-Miranda statements were given in response to custodial interrogation. Miranda warnings are required only after the person being questioned "is taken into `custody' or his freedom has otherwise been significantly restrained." Oregon v. Elstad, 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222, 232 (1985). It is "custodial interrogation" rather than the "mere `focus' upon a particular suspect" which triggers the requirement that Miranda warnings be given. State v. Graves, 60 N.J. 441, 448 (1972); State v. Marks, 201 N.J. Super. 514, 527 (App.Div. 1985), certif. den. 102 N.J. 393 (1986). See also State v. Downey, 206 N.J. Super. 382, 396-397 (App.Div. 1986). The crucial question therefore is whether defendant was in custody at the time he was questioned by Officer Ingenito.
Custody in the Miranda sense does not necessitate a formal arrest or that the questioning occur in a police station. Custody may occur in a suspect's home or a public place. State v. Godfrey, 131 N.J. Super. 168, 175 (App.Div. 1974), aff'd, 67 N.J. 267 (1975). In State v. Cunningham, 153 N.J. Super. 350, 352-353 (App.Div. 1977), we stated that the test to be applied in determining whether there has been custodial interrogation was stated by the Supreme Court of California in People v. Stewart, 62 Cal.2d 571, 43 Cal. Rptr. 201, 400 P.2d 97 (1965), aff'd Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) as follows:
The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out "a process of interrogations that lends itself to eliciting incriminating statements" [citation omitted], analyze the total situation which envelopes the questioning by considering such factors as the length of *596 the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances. [43 Cal. Rptr. at 206, 400 P.2d at 102 (emphasis added)].
This is essentially the same test adopted in State v. Barnes, 54 N.J. 1, 6 (1969), cert. den. 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 525 (1970). The foregoing standard is known as the "objective reasonable man test" which holds that custody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely. State v. Godfrey, supra, 131 N.J. Super. at 176, n. 1. See also State v. Bruzzese, 94 N.J. 210, 219-220 (1983), cert. den. 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1985).
Here, the interrogation took place in the home of defendant's former wife in the presence of defendant's sister and her friend. The questioning took only a short time. There was nothing coercive in the environment in which the questioning occurred. Defendant was never restrained in any manner. Nothing was said or done to the defendant to suggest that he was not free to leave. Even though Ingenito had planned to detain defendant, that subjective determination was never communicated to the defendant. The interview lasted only a short period of time in surroundings totally lacking the "compelling atmosphere inherent in the process of in-custody interrogation." Miranda v. Arizona, supra, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. See also State v. Zucconi, 50 N.J. 361, 364 (1967). Additionally, an observation by the Supreme Court in Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) is applicable to this case:
* * * Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that *597 sort of coercive environment to which Miranda by its terms was made applicable, and to which it was limited. [emphasis added].
The limited detention involved here was not a significant restraint upon defendant's liberty as to invoke the need for the Miranda warnings. Also, Ingenito inquired as to the whereabouts of the gun for reasons of safety permitted by Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 911 (1968). We therefore conclude that defendant was not in custody at the time Officer Ingenito questioned him. As the court observed in Mathiason, the fact that defendant may have become a suspect before or during questioning did not create the need for Miranda warnings.
The State urges that an exception to the Miranda warning requirement in "on the scene" investigations should be applied. Miranda states that "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the factfinding process is not affected by our holding." Miranda v. Arizona, supra, 384 U.S. at 477, 86 S.Ct. at 1629, 16 L.Ed. at 725. In State v. Gosser, supra, 50 N.J. at 445-446 the Court cited this on-the-scene questioning "exception" to the Miranda rule.
State v. Gosser involved questioning that was similar to this case. After defendant in Gosser confided in a friend that something terrible had happened to his wife, the friend called the police. When a patrolman arrived at defendant's home he was upset and crying when he answered the door. There was caked blood on his pajamas and face. In response to the officer's question as to the nature of the trouble, defendant said that he had killed his wife. The officer radioed for assistance, and within a few minutes a sergeant and another patrolman arrived. The sergeant asked defendant what had happened. Defendant said he had shot his wife, and when asked where she was, he told them "upstairs." After the body and the gun were found, defendant was placed under arrest. The Court concluded that defendant's statements fell within the category of *598 "general on-the-scene questioning as to facts surrounding a crime." State v. Gosser, 50 N.J. 438, 446 (1967).
Although the question posed by Ingenito to defendant in the present case was more pointed  "Did you tell your ex-wife that you just killed your girlfriend?"  the evidence indicates that Ingenito's purpose was simply to ascertain what was going on rather than to elicit an incriminating response. Despite information that defendant had stated to his ex-wife that he had killed his girlfriend, Ingenito had observed nothing which gave him probable cause to believe that a crime had actually been committed because of the absence of any corroborating information. The police officers were directed to 18 Brown Place as the potential scene of a shooting or killing. Under the circumstances, the State argues that the police officers were entitled to conduct limited questioning pursuant to Gosser without having to first advise defendant of his Miranda rights. Because the pre-Miranda statements did not result from custodial interrogation, we find it unnecessary to decide whether Gosser is applicable.
The statement by defendant that instead of taking his children to the movies as planned, he went to his girlfriend's house and "they had an argument and he shot her ..." was volunteered by defendant and was not made in response to any questioning by Ingenito. The trial judge's conclusion that this statement was volunteered is amply supported by the record and we will not disturb it. Miranda does not apply to volunteered statements. State v. DeLane, 207 N.J. Super. 45, 49 (App.Div. 1986); State v. Elysee, 159 N.J. Super. 380, 387 (App. Div. 1978).
We are also persuaded that defendant's post-Miranda statements were properly admitted as evidence. Defendant raises the issue for the first time on this appeal that his distraught mental state precluded an effective waiver of his Miranda rights. Even though the failure to assert this claim in the trial court should bar our consideration of the issue, we nonetheless reach the merits of the claim. Based on our *599 careful study of the record, this issue is clearly without merit. Defendant's post-Miranda statements were made after a knowing, intelligent and voluntary waiver of his Fifth Amendment rights. State v. Hartley, 103 N.J. 252, 260 (1986). There was no coercive police activity connected with defendant's statements. Colorado v. Connelly, ___ U.S. ___, 107 S.Ct. 515, 521-524, 93 L.Ed.2d 473, 484-487 (1986).
Defendant also contends that the court erred in denying his motion for a new trial on the basis of receipt of a toxicological report subsequent to the trial which indicates that Lewis was under the influence of a large amount of drugs at the time of her death. He argued that such evidence would support his theory that Lewis was a "wild woman" when she returned to the van and that it was important that the jury have this information in evaluating his testimony regarding the scuffle leading to her death. During the trial the jury was informed the autopsy revealed fresh needle marks on the victim's left wrist. The fact of the needle marks was pursued to some extent on cross-examination of the pathologist, Dr. Sinha. In response to defense counsel's questions, Dr. Sinha admitted she did not have the benefit of a toxicological report and could not say what type of drug, if any Lewis had injected, although she noted that heroin was the most common drug to inject.
In summation defense counsel argued to the jury that Lewis may have been under the influence of drugs which may have affected her behavior. However, at a later point in his summation when he said "and she, with the drug in her ," the prosecutor objected. The trial judge sustained the objection and advised the jury that "there is no proof that I heard that there was drugs in the body of Magda Lewis. All we have is testimony that there was a fresh puncture wound. Whether that is an appropriate piece of evidence to lead to a reasonable inference is up to you."
The prosecutor in his summation referred to the defense theory that Lewis had injected drugs and pointed out that "Dr. Sinha told you there is no toxicological report that shows that." *600 He then proceeded to discredit the idea that Lewis could have cocked the gun the second time even if she had been on drugs.
In ruling on the motion for a new trial, the trial judge concluded that the toxicological report, which showed that Lewis had several types of drugs in her blood at the time of her death, constituted evidence which was "potentially material." He was satisfied that it was evidence which was not available to defendant at the time of trial. On the issue of whether the new evidence would probably change the jury verdict, the judge reviewed the evidence and concluded:
Drugs were in the case. Credibility was before the jury. Certainly the drugs as I referred to them were not in the case with the precision that they should have been. But having all that it did before them, including the defendant's admissions, his conduct after the act, the operability factor of the gun, would the fact that there were drugs in the system of the victim and would testimony as to the amount and the effect of the actual drugs in the victim's body have probably altered the guilty verdict? I think not.
* * * * * * * *
... There was independent testimony that the shots were discharged in relative rapid succession, within five or ten seconds of each other. There was also a description that the second shot came immediately after the first shot. There was a scream after the first shot. The shot went through the chest into the heart ventricles and aorta and this militates against any reasonable conclusion that the victim herself shot the second bullet after pulling the hammer and after being struck in the chest with that type of wound. And all within seconds.
State v. Carter, 85 N.J. 300, 314 (1981) establishes a three-pronged test for determining when a new trial is to be granted based on newly discovered evidence: "the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."
We agree with the trial judge that it is highly improbable that the toxicological report would have altered the jury's verdict. Also, the evidence presented at trial is cumulative. The jury was permitted to infer that the presence of fresh needle marks indicated recent injections of drugs, probably *601 heroin. The jury's verdict was most likely based on its rejection of the defense theory that the shooting was accidental. The defense theory was rendered implausible by evidence that the gun had to be cocked and required four and one-half pounds of pressure to pull the trigger and that it was unlikely that Lewis shot herself because one bullet entered her left chest and exited the right shoulder and the other entered her skull from the back of the head. Defendant's case was also undermined by his admissions to his ex-wife and police that he shot Lewis.
We have considered the other contentions raised in light of the record and find they are clearly without merit. R. 2:11-3(e)(2). We note, however, that the nine month sentence for possession of handgun without a permit is an illegal sentence. The judge mistakenly assumed the offense was fourth degree. It is a third degree offense and the sentence must be fixed between three years and five years. N.J.S.A. 2C:43-6a(3). The sentence must be corrected. State v. Womack, 206 N.J. Super. 564, 570 (App.Div. 1985), certif. den. 103 N.J. 482 (1986).
The judgment of conviction is affirmed except as to the sentence imposed on Count Three. The matter is remanded to the Law Division for resentencing on Count Three.
Affirmed and remanded.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] We have spelled the victim's name the way it appears in the indictment. We are, however, uncertain as to the correct spelling of her name.