**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0046-17T2

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

DEQUAN ROGERS,

    Defendant-Respondent.

_____

Argued September 26, 2018 – Decided  October 16, 2018

Before Judges Alvarez, Nugent, and Mawla.

On appeal from Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 15-02-0102.

Kimberly Savino French, Assistant Prosecutor, argued the cause for appellant (Michael H. Robertson, Somerset County Prosecutor, attorney; Robert Hawkes, Chief Assistant Prosecutor, of counsel and on the brief; Kimberly Savino French, of counsel and on the brief).

Susan L. Romeo, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Susan L. Romeo, of counsel and on the brief).

PER CURIAM

We granted the State leave to appeal from a July 17, 2017 order, which granted defendant Dequan Roger's motion to suppress statements he made to the police. The State also challenges the motion judge's decision to deny its request to call an investigator from the public defender's office as a rebuttal witness to impeach the credibility of a defense witness at the suppression hearing. Finding no abuse of discretion in the motion judge's determinations, we affirm.

The following facts are taken from the record of the suppression hearing. On the evening of October 13, 2014, Franklin Township Police Department officers responded to reports of a shooting in the parking lot of the First Baptist Church on Route 27 and a stabbing on Victor Street. Upon arrival, responding officers discovered two African-American men walking on Victor Street. One man, defendant, was holding his chest, covered in blood, and had a stab wound in the center of his chest.

Officers also discovered an African-American man in the First Baptist Church parking lot, later identified as Joell Burton, who had suffered a gunshot wound. Witnesses at the scene reported they observed two men running away from the church parking lot after shots were fired, but none had actually seen

A-0046-17T2

the shooting. Police also located a pocketknife with a pink handle located approximately twenty-five feet from where Burton was found.

Defendant and Burton were transported to Robert Wood Johnson Hospital in New Brunswick. Defendant was admitted to the hospital under a pseudonym to protect his identity. Franklin Township Police Captain Gregory Borlan ordered defendant was "not allowed to receive or make phone calls," and only immediate family members were permitted to have contact with defendant at the hospital. Officers remained with defendant until hospital security staff transferred him to a "secluded wing" where visitors could enter only by using a buzzer. Burton was pronounced dead at 10:10 p.m.

The following morning at approximately 8:30 a.m., Detective Omar Belgrave from the Somerset County Prosecutor's Office and Detective Brandon Domotor from the Franklin Township Police Department visited defendant at the hospital. Detective Belgrave noted defendant was "coherent" and "being connected to machines." Detective Belgrave testified this initial visit was "just [for] information gathering."

During this initial conversation, which was not recorded, defendant told the officers he was walking on the sidewalk along Route 27, en route to see his daughter. Defendant stated a group of approximately four individuals ran across

3

the street towards him, and one of the individuals stabbed him in the chest and arm. Afterwards, defendant ran towards Victor Street where his friend called 9-1-1. Defendant told the officers he did not get a good look at the person who stabbed him and he did not know the identity of the person who stabbed him.

Detectives Belgrave and Domotor then left the hospital, and the same day, interviewed Julian Molina, a witness who had posted information regarding the shooting on Facebook. Molina told the officers he heard an argument and a gunshot from the porch of his home, but did not see the actual incident, and his younger brother knew more about the incident. Molina also told the officers he heard from another witness, Samiir East, defendant had shot Burton.

Detectives Belgrave and Domotor then interviewed Julian Molina's younger brother, Anthony Molina, and East. Anthony Molina claimed he did not see what happened. However, East told officers he was walking on Route 27 with Burton when they heard "some type of conversation" and "yelling" from a group of individuals, including defendant, on the other side of the street. East said Burton became agitated and ran after defendant. After seeing defendant and Burton fight, East claimed he saw defendant take out a gun, fumble with it, and shoot Burton.

A-0046-17T2

After ending the interview with East, detectives obtained a search warrant to photograph defendant, and collect fingernail scrapings and clippings for DNA. Detectives Belgrave, Domotor, and Detective Mike Guerra then visited defendant in the hospital room. According to Detectives Belgrave and Domotor, defendant's grandfather was sitting in the main vestibule outside the secure area in the hospital. Once inside defendant's room, detectives found defendant awake, reclined, and watching television. No family members were in the room.

The detectives recorded the first ten minutes of this conversation with defendant. No Miranda[1] warnings were given prior to this conversation. At the beginning of the conversation, defendant said: "My mom was just here. She wanted to know something . . . Because my aunt was supposed to come up here." Detective Belgrave responded: "Okay. Well, we'll call your mom. Once we leave here we'll call her and let her know about the visitors. Okay?" Defendant repeated what he had told the detectives before and claimed he did not know who stabbed him. Defendant also denied arguing with or shooting anyone.

Detectives informed defendant they were going to "step out" of the room, to which defendant asked, "Can I have my aunt come up here?" Detective

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0046-17T2

Belgrave responded: "We have to talk to the medical staff . . . and then we have to call our place . . . to make sure."

Detectives briefly left defendant's room and returned to continue the questioning. This part of the questioning was also recorded. Detective Belgrave testified the questioning continued because "obviously, there was more information from the statements that we've gotten" from other witnesses who were interviewed. Detectives informed defendant they had spoken to other people and reviewed camera footage.

Defendant then changed his story, claimed Burton had stabbed him, and admitted he shot Burton in response. Defendant also admitted he was carrying a firearm for his own protection because he had seen a Facebook video of Burton stating he was going to kill defendant when he saw him.

Towards the end of the second recording, defendant's mother buzzed into defendant's room and the following exchange occurred:

> DEFENDANT'S MOTHER: (Inaudible)
>
> DETECTIVE DOMOTOR: Hello.
>
> DEFENDANT'S MOTHER: Hello.
>
> DETECTIVE DOMOTOR: Who's that?  That's your mom?
>
> DEFENDANT: Yeah.

A-0046-17T2

DETECTIVE DOMOTOR: Okay. We'll get her in here in a second, okay?

DEFENDANT: Huh?

DETECTIVE DOMOTOR: Have you seen her yet? Your mom? Has she been in here?

DEFENDANT: She was in here earlier −

DETECTIVE DOMOTOR: Okay.

DEFENDANT: − and she left.

DETECTIVE DOMOTOR: I'll get her in here in a second, okay. We just got to finish up with you and then we'll be out of here, all right?

Shortly afterwards, a nurse came into defendant's room to assist him using the bathroom. As the nurse was leaving, she asked Detective Domotor: "Um no visitors?" Domotor replied: "Yeah still no visitors, nothing . . . we'll figure out [what's] [sic] going on in like five minutes." The second recording lasted forty-eight minutes.

Afterwards, detectives left defendant's room again and determined, based on his statements, there was sufficient information to arrest him. Detectives returned to defendant's room, read him a <u>Miranda</u> waiver form, and defendant then provided additional details related to the events of the shooting. This third conversation was also recorded. Outside of defendant's room, detectives

A-0046-17T2

informed defendant's mother and grandfather no more visitors would be permitted because defendant was in custody.

Defendant was indicted for first-degree murder, N.J.S.A. 2C:11-3(a); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and fourth-degree possession of a firearm by a minor, N.J.S.A. 2C:58-6.1(b). Defendant filed his suppression motion. Over the course of six days, the motion judge considered testimony from several witnesses for the State, and defendant offered testimony from three witnesses. Pertinent to this appeal, defendant offered testimony from his mother regarding her access to defendant's hospital room during defendant's conversations with police. This appeal followed.

I.

The State raises the following arguments:

> POINT I − DEFENDANT'S PRE-MIRANDA STATEMENTS TAKEN AT THE HOSPITAL WERE LAWFULLY OBTAINED AS HE WAS NOT SUBJECTED TO CUSTODIAL INTERROGATION.
>
> POINT II − DEFENDANT'S POST-MIRANDA STATEMENT WAS PROPERLY OBTAINED AS HE VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY WAIVED HIS MIRANDA RIGHTS, AND IT WAS NOT TAINTED BY THE PREVIOUS STATEMENTS.

POINT III − THE COURT ERRED IN BARRING THE STATE FROM CALLING THE DEFENSE INVESTIGATOR TO WHOM A DEFENSE WITNESS GAVE A CONFLICTING STATEMENT.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (alteration in original) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" Ibid. (alteration in original) (citing Robinson, 200 N.J. at 15 (quoting State v. Elders, 192 N.J. 224, 244 (2007))). "Thus, appellate courts should reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Gamble, 218 N.J. 412, 425 (2014) (citing Elders, 192 N.J. at 244). "A trial court's interpretation of the law, however, and the consequences that flow from established facts are not entitled to any special deference." Ibid. (citing State v. Gandhi, 201 N.J. 161, 176 (2010)). "Therefore, a trial court's legal conclusions are reviewed de novo." Ibid.

The State argues the motion judge incorrectly found defendant was in custody during the questioning in his hospital room and made inadequate findings of fact in support of his ruling. We disagree.

"Forty years after <u>Miranda</u> . . . , no rule of law is better understood by law enforcement officers than the duty to advise a suspect subject to custodial interrogation of his right to remain silent and his right to the assistance of counsel." <u>State v. O'Neill</u>, 193 N.J. 148, 153 (2007). "Indeed, the term '<u>Miranda</u> rights' is now so familiar that it is part of our popular vocabulary and culture." <u>Id.</u> at 153-54. "Significantly, <u>Miranda's</u> guiding principles inform New Jersey's privilege against self-incrimination." <u>Ibid.</u>

"<u>Miranda</u> warnings are constitutionally mandated when a suspect is subjected to custodial interrogation by law enforcement officers." <u>State v. Choinacki</u>, 324 N.J. Super. 19, 43 (App. Div. 1999). We have defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>State v. Pierson</u>, 223 N.J. Super. 62, 66 (App. Div. 1988) (quoting <u>Miranda</u>, 384 U.S. at 444). "[I]n New Jersey we recognize the 'objective reasonable man test' in evaluating whether questioning is custodial

and . . . that 'custody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely.'" State v. O'Loughlin, 270 N.J. Super. 472, 477 (App. Div. 1994) (quoting State v. Coburn, 221 N.J. Super. 586, 596 (App. Div. 1987)).

"Miranda is not implicated when the detention and questioning is part of an investigatory procedure rather than a custodial interrogation . . . or where the restriction on a defendant's freedom is not of such significance as to render him 'in custody.'" Pierson, 223 N.J. Super. at 66-67 (citations omitted). "In determining whether a custodial interrogation has occurred, a court must examine all of the circumstances surrounding the interrogation." Choinacki, 324 N.J. Super. at 44 (citing Stansbury v. California, 511 U.S. 318, 320-21 (1994); O'Loughlin, 270 N.J. at 77; Coburn, 221 N.J. Super. at 596). "A court may consider on a case-by-case basis attendant circumstances such as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." Choinacki, 324 N.J. Super. at 44 (citing Pierson, 223 N.J. Super. at 67; State v. Cunningham, 153 N.J. Super. 350, 353 (App. Div. 1977)). "[T]he totality of the

circumstances" determine the issue of custody. State v. Nyhammer, 197 N.J. 383, 409 (2009).

In the context of Miranda, we have found "[a] hospital room generally lacks the 'compelling atmosphere inherent in the process of in-custody interrogation.'" Choinacki, 324 N.J. Super. at 44 (quoting State v. Zucconi, 50 N.J. 361, 364 (1967)). We have found statements made by a defendant while in a hospital bed to be appropriately admitted when the motion judge has "concluded that there was no custodial interrogation requiring Miranda warnings, that there was no overbearing or overreaching in any interrogation, that the statements were voluntary, and finally that the evidence convinced him of the reliability and trustworthiness of the statements made by defendant." State v. Figueroa, 212 N.J. Super. 343, 349-50 (App. Div. 1986). We noted "[o]ther jurisdictions have similarly concluded that the fact that an individual is hospitalized and unable to leave due to disabling injuries when questioned by the police does not warrant the automatic administration of the Miranda warnings in the absence of indicia of custody." Choinacki, 324 N.J. Super. at 45.

In Choinacki, we deemed statements by a defendant while confined to a hospital bed admissible. Choinacki, 324 N.J. Super. at 46-47. There, the

defendant was hospitalized as a result of a fatal car crash, which occurred during an illegal street race. Id. at 24. An officer reported to the scene and began questioning the defendant for a few minutes until the defendant started to exhibit signs of pain and was transported to a hospital. Ibid. The officer followed the defendant to the hospital in order to continue questioning and determine if she had information about the driver who was killed in the accident. Id. at 24-25. After defendant was assessed by medical personnel, the officer insisted on speaking to the defendant ahead of her family. Id. at 25. The defendant was crying in pain throughout the questioning, which lasted ten minutes. Ibid.

After the initial questioning of the defendant, the police interviewed multiple witnesses who gave statements regarding events leading up to the crash. Id. at 26-27. Two days after the accident and following surgery, the defendant was questioned by another officer in the hospital. Id. at 26. The second officer was instructed by medical personnel not to mention anything about the driver who was killed to the defendant. Ibid. The defendant claimed to not know any information about the other driver and initially did not respond when asked how fast she was driving prior to the accident. Ibid. Following a short pause, the defendant asked if there were any witnesses to the accident. Ibid. After the

13

officer told her there were in fact witnesses, the defendant began to cry and the officer ended the interview. Ibid.

We concluded the un-Mirandized statements were admissible because:

> [D]efendant was not physically detained nor subjected to continuous police supervision for a substantial period of time prior to giving her statements. Rather, the circumstances surrounding the taking of both statements indicate that she was not in custody. The police requested permission to speak to defendant on both occasions. No guards were posted outside the door of her hospital room, nor was she formally arrested. Others were permitted to be present during the interviews, and there was no overbearing police conduct.
>
> [Id. at 47.]

Here, the circumstances were different from Choinacki, and support the trial judge's decision to grant defendant's motion. Although defendant was not under police supervision he was, as the motion judge found, "isolated and never told . . . he was free to leave." The recordings also reveal when defendant's mother arrived, and detectives learned she was defendant's mother, she was not permitted into his room until the interview was concluded. The record establishes that detectives were controlling who could enter the room because when a nurse asked if defendant could have visitors a detective responded "still no visitors." The trial judge did not abuse his discretion by relying on the police

14

recordings to support his conclusion the police were controlling the hospital room and isolating defendant from his relatives. Given the fact-sensitive nature of the inquiry, the deference we accord the trial judge's feel for the evidence, and the evidential support in the record for his findings and conclusions, we affirm the suppression order.

III.

The State argues defendant voluntarily, knowingly, and intelligently waived his rights after being read Miranda warnings. The State further contends the statements obtained from defendant before he was Mirandized were legally obtained and thus did not taint the statement made after the Miranda warning.

"The question of the voluntariness of a statement is not solvable by any mathematical formula." State v. Puchalski, 45 N.J. 97, 106 (1965). "In New Jersey, the State must demonstrate validity of waiver beyond a reasonable doubt." State v. Adams, 127 N.J. 438, 447 (1992). A waiver may be inferred from the particular factual circumstances following proper administration of Miranda warnings to a suspect in custody. See State v. Kremens, 52 N.J. 303, 311 (1968). A determination of voluntariness must be made after considering "the totality of the circumstances." Nyhammer, 197 N.J. at 409.

A-0046-17T2

In O'Neill, the Supreme Court explained the voluntariness of a Miranda waiver where police question a suspect first, and thereafter give a Miranda warning. The Court stated "[t]he two-step, 'question-first, warn-later' interrogation is a technique devised to undermine both the efficacy of Miranda and our state law privilege." O'Neill, 193 N.J. at 180. The Court stated:

> [A]s a matter of state law, we hold that when Miranda warnings are given after a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination.
>
> [Id. at 180-81.]

After a custodial interrogation has occurred, a five-factor test is used to determine whether the warnings functioned to allow the defendant to exercise his privilege against-incrimination. Id. at 181.

> In making that determination, courts should consider all relevant factors, including: (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his Miranda rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning. The factual

16

> circumstances in each case will determine the appropriate weight to be accorded to any factor or group of factors.
>
> [Ibid.]

Here, because we have upheld the motion judge's determination the pre-Miranda statement was a custodial interrogation, we must consider the judge's application of the five factors under O'Neill. The motion judge concluded factor one was met because "[t]he questioning occurred in a police-dominated atmosphere with defendant being isolated from friends and family while confined to a hospital bed." Prior to receiving his Miranda warning, defendant confessed to possession of the gun, described the gun, and the number of times he shot Burton. The judge found factor two was met because the place of defendant's pre- and post-Miranda statements were the same. The judge found the amount of time between each statement was "close in time and place." Factor three was established, because the same detectives questioned defendant during his pre- and post-Miranda statements. Factor four was also met, because detectives did not inform defendant his pre-Miranda statement could not be used against him. Under factor five, the judge concluded the post-Miranda statement was "a continuation of the [pre-Miranda] statement, and is therefore poisoned from the first."

A-0046-17T2

We have no basis to second-guess these findings. The record amply supports the O'Neill factors were met and defendant's post-Miranda statement should be suppressed.

IV.

Finally, the State argues the motion judge erred in barring it from subpoenaing Tom Hofgesang, an investigator with the Public Defender's Office, as a rebuttal witness to impeach testimony by defendant's mother. The mother testified she met defendant's grandfather at the hospital, and then entered defendant's room. She claimed the detectives were present and told her she was not permitted in the room and "kicked [her] out."

The State sought to impeach her testimony with rebuttal testimony from Hofgesang that his investigation revealed defendant's grandfather told her to wait outside, rather than the detectives. The State also sought to have Hofgesang testify defendant's mother waited outside his room until 12:00 a.m. or 12:30 a.m., and never saw defendant that night. Defendant's mother had denied both assertions on cross-examination.

As a general proposition, N.J.R.E. 403 states "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice[.]" "A trial court's evidentiary rulings are entitled to deference

absent a showing of an abuse of discretion." State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)).

We find no abuse of discretion in the motion judge's denial of the State's request to subpoena Hofgesang as a rebuttal witness. Citing our holding in State v. Nunez, 436 N.J. Super. 70, 72-79 (App. Div. 2014), the motion judge concluded "allow[ing] a defense expert to be called by the State would have a chilling effect on defense counsel doing their job." The judge also found the prejudice of permitting the rebuttal testimony would outweigh the probative value because whether defendant's mother went into the room or whether her father kept her out were "not essential to [the] [c]ourt's determination."

In Nunez we held it was error to permit the State to bolster the credibility of its witness by calling a defense investigator and using a report the investigator had prepared for the defendant, which the defense had no intent to use at trial. Nunez, 436 N.J. Super. at 78. We concluded the use of inculpatory defense information violated defendant's constitutional right to effective assistance of counsel. Ibid.

Although the facts here may be distinguishable from Nunez, because the State sought Hofgesang's testimony for impeachment purposes only, the use of a defense report to impeach a witness whose testimony was not central to the

issues before the motion judge does not outweigh the infringement on defendant's constitutional right to counsel. See State v. Mingo, 77 N.J. 576 (1978) (citing Sixth Amendment considerations and holding a defense expert report whom the defense did not intend to use at trial was not discoverable by the State). For these reasons, we find no abuse of discretion in the motion judge's decision to deny the State its rebuttal witness.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0046-17T2