734 A.2d 324 (1999)
STATE of New Jersey, Plaintiff-Respondent,
v.
Bobbie CHOINACKI, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 4, 1999.
Decided July 2, 1999.
*326 Matthew Astore, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Astore, on the brief).
Janet Flanagan, Deputy Attorney General, for plaintiff-respondent (Peter Verniero, Attorney General; Nancy Peremes Barton, Deputy Attorney General, on the brief).
Before Judges PETRELLA, D'ANNUNZIO and COLLESTER.
*325 The opinion of the court was delivered by COLLESTER, J.A.D.
On April 26, 1995, an Atlantic County Grand Jury returned Indictment No. 95-04-0951-B, charging defendant Bobbie Choinacki with first degree aggravated manslaughter, contrary to N.J.S.A. 2C:114(1) (count one), and second degree reckless manslaughter, in violation of N.J.S.A. 2C:11-4(b) (count two). The indictment also charged co-defendant, Darrin Cobb, with the same counts as well as charges of witness tampering, tampering with physical evidence and two counts of hindering apprehension.
Tried separately to a jury, defendant was found not guilty of aggravated manslaughter but convicted of reckless manslaughter. The trial judge also adjudicated her guilty of driving under the influence of alcohol pursuant to N.J.S.A. 39:4-50 and reckless driving under N.J.S.A. 39:4-96. The sentencing judge merged the reckless driving offense into the reckless manslaughter conviction and imposed a seven year prison term in addition to the various mandatory fines and penalties under both the indictable and motor vehicle convictions. Defendant's motion for a new trial was denied.
The testimony at trial adduced the following factual setting. During the evening hours on Sunday, September 25, 1994, Howard Solomon, Kevin Standing and twenty-seven year old Betsy Madera were among the many who attended a networking reception, the opening event of the annual two-day ASA Legal Systems Users Conference, at the Seaview Marriott in Atlantic City. At approximately 9:30 p.m., the three decided to return to their own hotel, a nearby Days Inn. Due to her unfamiliarity with the area, Madera decided to follow Solomon and Standing, who were traveling together in Solomon's car.
As the two cars made their way south on Route 9, a two-lane road, Solomon was careful to keep his speed down to 40 m.p.h. so that he would not lose sight of Madera in her red Toyota. The road began to curve and, as Solomon rounded the bend, both he and Standing exclaimed, "Holy shit!" as they watched in sudden fear as two cars came barreling towards them in the opposite lane at a high rate of speed. Standing estimated that the cars were no *327 more than one or two car lengths apart and that they were traveling in excess of seventy miles per hour. He believed that they might have been racing. As the two went by, both Solomon and Standing saw the lead car begin to fishtail and it appeared to them that the driver was losing control and swerving towards their lane. Notably, neither of the two men saw any contact between the two vehicles. Moments later, just after the two cars passed out of sight, Solomon and Standing heard a crash and they immediately pulled over.
Standing ran to the first car at the accident site, which he recognized as Madera's red Toyota, while Solomon dialed 911 on his car phone. Standing approached Madera, shook her and checked for a pulse. Finding none, and noting that Madera's eyes were fixed, Standing concluded that she was dead.
Patrolman Troy Midgette of the Galloway Township Police Department responded to the scene after receiving a call at 9:59 p.m. regarding a motor vehicle accident. He observed two cars, one a red Toyota and the other a blue Mustang GT, off to the side of southbound Route 9. He proceeded first to the red Toyota and determined that the driver was dead. He then headed over to the Mustang which he noted had sustained a great deal of frontend damage.
Emergency workers had already begun treating the driver of the Mustang, later identified as twenty-one year old Bobbie Choinacki. Midgette approached and asked defendant what had happened. According to Patrolman Midgette, defendant responded that she did not know what had happened, but that she "must have fallen asleep." As defendant spoke, Midgette detected an odor of alcohol on her breath. He noted that, although obviously injured, defendant appeared to be without pain and indifferent to her situation.
Patrolman Tom Davey, also of the Galloway Township Police Department, arrived at the scene shortly after Midgette. He approached the Mustang and asked defendant what had happened. According to Davey, defendant responded by asking him about the condition of her car and about some officers she knew. Defendant became upset and began to exhibit signs of pain and Davey discontinued his questioning after only a minute or two.
Defendant was transported to the Atlantic County Medical Center. Davey and another officer made their way to the hospital to retrieve a blood sample from defendant for testing purposes and to interview her a second time. Davey, aware that witnesses described racing-type activity, was eager to learn if defendant knew the other driver. However, Davey was unable to get immediate access to defendant because she was being worked on by medical personnel. He placed a request for a blood sample which was eventually drawn at 11:43 p.m.
Defendant was treated by Dr. Joel Bayer. He diagnosed a hematoma on her forehead, broken tooth, compound fracture of her left ankle, concussion and right ankle fracture. At 10:50 p.m., Dr. Bayer found defendant oriented and alert, with clear speech.
When Dr. Bayer permitted access to defendant, Davey insisted on being allowed to speak to her ahead of her family. During the subsequent ten-minute interview with defendant, defendant told Davey that after completing her 12:00 to 8:00 p.m. shift at the Trump Plaza Casino, she stopped at a local restaurant/bar called Sabatini's. She said that sometime later a friend named Terry Braun gave her a ride to her car and she headed home. After she drove on Route 9, a Mustang began following her closely. She refused to let him pass because she was in a hurry to get home so that she could use the bathroom. Defendant stated that she was traveling at approximately 50 to 55 m.p.h. and acknowledged that she and the other driver, whom she said she did not know, passed a Bronco. Defendant stated that she did not remember the collision, noting that she *328 had had only three hours of sleep the night before and that she might have fallen asleep.
Davey testified that throughout this interview defendant was crying and appeared to be in pain, but she never said that she did not understand his questions. He noted that she asked him again about certain officers she knew and about the condition of her car. He did not tell her that the accident had involved another car and resulted in a fatality.
One of defendant's friends, Lisa Klein, also spoke with defendant while she was in the emergency room after the accident. According to Klein, both she and defendant were crying at the time, but she was sure that defendant knew who she was. Klein recalled defendant telling her that the other driver had been "fuckin' with" her. Shortly thereafter defendant was taken away for surgery to clean and realign her fractures and also for the insertion of pins and screws to keep the bones in place.
At 10:00 a.m. on Tuesday, September 27, 1994, Sergeant William Taggart of the Atlantic County Prosecutor's Office, stopped by the hospital and obtained permission to speak with defendant. He was cautioned, however, by medical personnel not to mention the victim's death. Immediately after he introduced himself to defendant, who was awake, she asked about one of his fellow officers. In response to Taggart's questions defendant denied that she had taken any drugs other than a Benadryl prior to the accident, and she claimed that she had only one beer and one shot while at Sabatini's. She denied knowing the driver of the other car, which she recalled as being dark in color.
When Taggart asked defendant how fast she was traveling prior to the accident, she did not immediately answer. Instead, after a ten-second pause, defendant asked Taggart whether there were any witnesses. When Taggart informed her that there were witnesses, defendant began to cry and stated that her car meant everything to her and that she wanted to die. Because defendant's condition had deteriorated during the interview and she appeared to be in pain, Taggart ended the interview. He testified that defendant did not seem to be under the influence of any drugs during the interview, although he assumed that she was taking medication. He said that defendant had no trouble understanding his questions, and that he had no trouble understanding her responses. In his estimation, defendant appeared to be talking freely.
Defendant underwent a second surgery on September 28, 1994. The following day she was moved to a regular room. Lisa Klein again visited defendant, who appeared "out of it," but well enough to ask Klein if she had seen her car and if it was totaled. Klein responded that she had not seen the car and did not know if it was totaled. Defendant then told her that she had stopped off at a bar after work and had a beer and a shot. She related that after she got on Route 9, a Mustang with primer spots on it came up fast behind her, high beamed her and rode her bumper so that she thought that it was going to hit her.
Defendant told Klein that the other Mustang passed her and then slowed down after pulling in front of her. She then passed him, but he again passed her and slowed down. The two traded places one more time and then defendant tried to pass a third time. However, according to defendant, this time the other driver refused to let her reenter the proper lane, first by speeding up, and then by slowing down. Defendant stated that she remembered seeing lights in the distance but that everything then went black. According to Klein, at no point did defendant tell her that she was afraid.
During the course of the investigation, the police inter-viewed a number of witnesses who offered statements regarding certain events leading up to the crash. One of these witnesses, Terry Braun, one *329 of defendant's fellow employees at Trump's Plaza, confirmed that he met defendant at Sabatini's shortly after 8:00 p.m. on the night of the accident. He stated that he saw defendant drink one full beer, plus part of another. According to Braun, he and defendant left the bar at approximately 9:30 or 9:40 p.m. and retrieved his car from the Caesar's parking garage. Braun related that he then dropped defendant off at the employee parking lot (where she had left her car) and drove off.
Tony Amodio and his wife Christine testified that they were traveling northbound in a Ford Bronco at approximately 50 m.p.h. on Route 9 in Absecon when Tony, who was driving, noticed two Mustangs, one a dark color and the other gray, coming up fast behind them in his rear-view mirror. He stated, "Look at these assholes," and Christine turned and watched as the two Mustangs passed them on the driver's side. She confirmed that the lead car was dark in color while the second had gray primer on it. According to Tony, the Mustangs were traveling approximately 80 m.p.h., while Christine estimated their speed to be between 60 and 70 m.p.h.
Tony related that after the cars passed them, the lead car pulled back into the northbound lane and the other moved alongside it as though to pass, but then backed off and moved in behind it because of oncoming traffic. Christine and Tony agreed that the two cars then passed another car the same way by moving into the southbound lane. Christine believed that the two Mustangs might have passed another car, but she was not sure. She stated that the Mustangs were traveling side by side as they entered a curve in the road. Shortly thereafter, they came upon the accident scene and pulled over to offer assistance.
Tony stated that the Mustang at the crash site was the lead car that passed them. Tony believed that the two cars were racing because of their speed and the way they were weaving in and out of traffic. It appeared to him that neither driver wanted to yield to the other. Tony stated that when the two cars were traveling side by side it seemed as though they were drag racing.
According to witness William Hull who was heading northbound on Route 9 at approximately 9:45 p.m., the two cars came up fast behind him. He immediately slowed down to 35 m.p.h. to let them pass. He did not see the cars return to the right lane because of the bend in the road. As he rounded the bend, he saw debris and pulled over and ran to defendant's Mustang.
Adrian Bravenboer informed police that sometime after 9:30 p.m., he was traveling northbound on Route 9 at approximately 45 to 50 m.p.h. when he was passed by two cars which were doing about 75 m.p.h. He stated that, after passing him, the lead car moved back over into the proper lane but that the second car stayed in the left lane and pulled up alongside the lead car as they traveled uphill.
According to Bravenboer, the two cars remained side-by-side entering the bend although there was more than enough room between the lead car and his own car in the northbound lane. He believed that the two cars were racing and that the second car was trying to pass the lead car. As they entered the bend, Bravenboer saw the car on the left slam on its brakes and then, as he rounded the bend, he saw dust and debris all over the road. He noted that the car which had been on the left was disabled on the side of the road, while the other car which had been involved in the racing had disappeared.
Stephen Nanfara informed police that he was stopped at the corner of Shore Road and Route 9, waiting to turn onto Route 9 when he saw two Mustangs, one blue and one gray, come flying by on the northbound side of Route 9. He estimated that the gray Mustang was about one or two car lengths behind the blue GT which he believed was traveling at between 100 to *330 120 m.p.h. He stated that he thought the two cars were racing.
Pasquale Mucciolo described talking to his girlfriend at a payphone located along Route 9 when he heard the sound of roaring engines and saw two Mustangs come speeding by traveling side by side at approximately 100 m.p.h. Just before the two cars disappeared around a bend, he saw the car on the left hit its brakes and heard the sound of downshifting and a backfire. He saw the car on the left shake as its driver tried to get back over into the right lane. He did not see the car on the right attempt to brake. When he later drove by the accident scene he noticed that one of the Mustangs he had observed was involved.
Scott Beibin, who was living in a secondfloor apartment in a house located on the Route 9 "blind" curve, told police that he glanced out a window upon hearing the sound of revving engines. Although his view of Route 9 was partially obscured by trees, he was able to see two cars pass by traveling side by side at a fast rate. Almost immediately after the two cars passed by, he heard the sound of a crash. Beibin then heard a car shift gears and drive off.
Dr. Walter Hofman, a forensic pathologist, performed an autopsy on the victim and determined that Madera died from multiple injuries resulting from blunt force trauma. Specifically, he noted that she sustained multiple fractures of her skull, vertebrae, ribs, left arm and both legs. He said that the force of the crash had caused her brain to split, and her lungs, aorta, liver and spleen to tear, resulting in massive hemorrhaging. In his opinion death was instantaneous.
On September 26, 1994, Dr. Steven Kuranovich, principal forensic scientist at the state police lab in Hammonton, New Jersey, received the two vials of defendant's blood which had been drawn at the hospital the night of the accident. Blood tests revealed a blood alcohol content of .089%. Defendant was arrested on February 6, 1995, and subsequently indicted in connection with Madera's death.
At trial the State presented the expert testimony of Investigator Barry Wythe of the Atlantic County Prosecutor's Office, who had received extensive training in accident investigation and reconstruction. Wythe testified that based upon his examination of the damage to the two cars, the eyewitness accounts and the skid-marks, that at the time of the accident defendant was traveling between 67 and 70 m.p.h., and that the victim was traveling at approximately 40 m.p.h. He noted that the posted speed limit around the curve on Route 9 is 45 m.p.h. and that it is even lower (40 m.p.h.) on certain stretches of the highway leading to the crash site. Analogizing each car to a clock with the center of the hood at 12:00, Wythe believed that the victim's car was struck at the equivalent of 11:00 while the initial impact to defendant's car occurred at 12:30 or 1:00. He opined that upon impact the defendant's car rotated counterclockwise and traveled 187 feet, while the victim's car lost all speed and was actually pushed backward.
Wythe noted that Betsy Madera's Toyota left no skid marks at the scene but that there were skid marks from a third vehicle, not the defendant's Mustang, which did not show any evidence of fishtailing. He stated that at some point either in October or November of 1994 the police received tips regarding the third car and the identity of its driver. He related that in early 1995 Darrin Cobb became the exclusive other suspect.
Although he had not initially noticed any damage to defendant's vehicle, Wythe acknowledged that defendant's investigator brought to his attention that there was a small mark on the rear bumper of defendant's car. However, Wythe did not believe that this mark could have resulted from an impact from the rear because there was no corresponding damage to the superstructure of the car and the mark *331 was actually located on a recessed portion of the bumper. In Wythe's estimation, the mark was nothing more than a smear which did not go into the bumper but ran across the bumper laterally.
Wythe also said that there was no evidence of contact between the car found to belong to Cobb and defendant's Mustang, noting that defendant never informed the police or anyone else that she had been bumped.
Dr. John Brick, a biological psychologist called by the State, gave an opinion as to defendant's peak blood alcohol content. Noting that the documented blood alcohol content was .089% at 11:43 p.m., Brick testified that a concentration of .089% reflected the consumption of the equivalent of 47 ounces of beer or four one-half ounce shots of 80 proof alcohol. Although peak blood alcohol content can occur anywhere from thirty to ninety minutes after consumption of the last drink, Brick believed that defendant would not have required the maximum amount of time to achieve her peak because she consumed distilled spirits which enter the system more rapidly. He estimated that defendant's peak blood alcohol concentration would have occurred approximately fifty minutes after she stopped drinking or twenty-plus minutes after the accident.
In order to calculate defendant's peak blood alcohol content, Brick assumed that she had been drinking at an even rate, without consuming any food, between 8:00 p.m. and 9:30 p.m. and that alcohol was being eliminated from her system at the standard rate of .015% per hour. Utilizing a computer to create a curved graph, Brick determined that defendant's peak blood alcohol concentration was .104%. He noted that if defendant consumed distilled spirits just before she left the bar, her blood alcohol content at the time of the accident would have been a little lower. Brick also stated that although he once used straight-line graphs to chart blood alcohol content, he no longer uses them because they cannot take into consideration as many variables and often result in overestimated peaks.
Brick testified that individuals with a.10% blood alcohol concentration are slightly impaired in their ability to operate a car even though they do not necessarily exhibit all of the classic signs of drunkenness. He noted that such individuals have difficulty dividing their attention and adjusting to glare from headlights, and also exhibit slower reaction times, impaired judgment and decreased attention to risk. Although defendant's blood alcohol concentration may have been a little less than.10% at the time of the accident, Brick had no doubt that she was impaired. He estimated that defendant's relative risk for an accident was six-plus times greater than a person with no alcohol in their system.
Defendant elected to testify in her own defense. She stated that in September 1994 she was attending a local community college and working part-time as a cashier at the Trump Plaza Casino Hotel. According to defendant, she owned a blue Mustang GT which she had purchased in April 1993. She explained that she took meticulous care of her car, washing it every other day and that there was absolutely no damage to the rear of the car prior to the accident.
Defendant confirmed that on Sunday, September 25, 1994, she left work at approximately 8:00 p.m. after working an eight-hour shift and headed to Sabatini's in order to meet Braun. She said that she had eaten a slice of pizza and a salad between 3:00 and 4:00 p.m. While at the bar, she ordered a Coors Lite, which she said she drank over the course of the next hour. At approximately 9:00 p.m., she returned to the bar from the bathroom and found a shot waiting for her. She drank the shot, although she did not know what it contained. Immediately after, she took a sip from another beer in order to rid her mouth of the taste of the shot. Ten or fifteen minutes later, she and Braun left *332 the bar, retrieved Braun's car and then drove to where her car was parked.
Defendant testified that she did not feel intoxicated as she started her car and headed north towards home. She stated that while she was following a Bronco on Route 9 she noticed a car come up so close behind her that she thought it was going to hit her. She noted that approximately three weeks earlier she had been badly frightened after being followed home by an unidentified car which repeatedly passed her and then slowed down. Defendant explained that because of this prior incident, she became frightened when the car which had been tailgating her, passed her and slowed down. She acknowledged that she did not know if it was the same car that had followed her three weeks earlier.
Defendant testified that she passed the Bronco in order to get away from the car behind her, the other car also passed the Bronco and resumed tailgating her. Defendant stated that she did not recall passing any other cars. According to defendant, as she approached the critical curve in the road, she took her foot off the gas and glanced twice in her rear view mirror. She recalled seeing headlights for the first time when she glanced in the mirror, but not the second time, and that was when she began to fishtail. She testified that the last thing she remembered before waking up in the hospital was looking ahead of her and seeing approaching headlights. She denied having any recollection of her conversations with Klein, Davey or Taggart.
Jeanne Ferwerda, a friend of defendant, confirmed that on September 8, 1994, defendant told her that someone had been following her home from work the last couple of nights and that she was scared. Ferwerda stated that when she later visited defendant in the hospital, defendant informed her that she had been followed on the night of the collision. According to Ferwerda, defendant stated that she became scared when a car began tailgating her and then passing her and slowing down. However, Ferwerda acknowledged that defendant told her that she also passed the other car several times.
Steven Schoor, a civil engineer with extensive experience in accident reconstruction, testified on behalf of defendant that the damage to the rear bumper of her car could have occurred from being struck by Cobb's front bumper. He noted that the fanning out of the damage from right to left was consistent with a minor impact. He explained that although defendant and Cobb were evidently traveling at high speeds, a minor impact could still have occurred because both cars were traveling at approximately the same speed. He stated that a small bump could have either exacerbated defendant's fishtailing or made her swerve. Schoor admitted, however, that the damage to defendant's car could have predated the accident or occurred as a result of flying debris.
Defense witness Richard Saferstein, a forensic toxicologist, explained that he utilized a straight-line method, which he characterized as a more reality-based methodology, to track defendant's blood alcohol content. Assuming she consumed one and one-half twelve-ounce beers and two ounces of distilled spirits at a consistent pace over a ninety-minute period, he estimated defendant's blood alcohol content at .085% at the time of the accident ultimately peaking at .10% at 10:30 p.m. However, Saferstein agreed with Brick, the State's expert, that if defendant drank significantly more during the latter part of the drinking period, her blood alcohol content at the time of the accident would have been below .08%.
Because alcohol can affect certain people more than others, Saferstein was unwilling to state that defendant was definitely impaired with a blood alcohol content below.10%. He acknowledged, though, that an individual with a blood alcohol content of.08% is two or three times greater a risk of collision than an alcohol-free driver. Saferstein also agreed that an individual with *333 a blood alcohol content of .10% to .11% would be impaired and constitute a safety risk due to deteriorated judgment, loss of self-control and diminished visual acuity.
Substantial evidence was also presented by defendant regarding co-defendant Darrin Cobb, who was arrested in connection with this case on February 15, 1995. Most notable was the testimony of Leslie Belber Barker, Cobb's former girlfriend. She stated that on September 25, 1994, at 10:00 p.m., Cobb came flying through the door after work looking very shaken. According to Barker, she and Cobb conversed and then he went back outside to clear glass off the front of his car, a gray Mustang. Thereafter, they drove to the crash site using her car because Cobb did not want his car seen in the area. However, they never made it to the actual site because of police roadblocks.
Taggart also testified as a witness on defendant's behalf and confirmed that Cobb purchased a gray 1989 Mustang on May 24, 1994. Officer Emory Silipigni of the Pleasantville Police Department related that Cobb and his Mustang, which carried license plates reading "ER778P," had been involved in a one-car accident on August 12, 1994, which resulted in damage to the car's right bumper and front fender. Detective Peter Romanelli of the Galloway Police Department reported that on October 16, 1994, he located Cobb's Mustang at South Jersey Auto Body in Absecon with significant damage to the right side of the car consistent with a substantial impact. Romanelli observed that the license plates registered to the car had been replaced with those belonging to a 1984 pick-up previously owned by Cobb and Barker which read "CL894P." Kirti Patel, a car salesperson at Sheehy Ford, testified that on November 3, 1994, Cobb came in looking to buy a car and claiming to have a trade-in, a 1989 Mustang LX five-speed, with a 5.0 liter, V-8 engine.
Margaret Choinacki, defendant's mother, testified that while she was at home one day in late May or early June 1994, she heard a very noisy car approaching. She walked outside to the front of her home and watched as the car, which she recalled as being gray, pulled into the driveway of the Sykes residence across the street. Choinacki quickly took a piece of aper and jotted down the car's license plate number which read "CL894P." She continued watching until the car drove off approximately five minutes later. Choinacki held on to this piece of paper until March 3, 1996, when she realized its potential significance and turned it over to defense counsel.
Numerous character witnesses testified that they knew defendant to be honest and truthful. Nonetheless, defendant was convicted by the jury of reckless manslaughter.
On appeal defendant argues the following:

POINT IBY PRECLUDING DEFENDANT'S HYPNOTICALLY-REFRESHED TESTIMONY THE TRIAL COURT INFRINGED IMPERMISSIBLY ON HER RIGHT TO TESTIFY ON HER OWN BEHALF UNDER THE DUE-PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, THE COMPULSORY PROCESS CLAUSE OF THE SIXTH AMENDMENT AND THE PRIVILEGE AGAINST SELF-INCRIMINATION OF THE FIFTH AMENDMENT, AND ON HER DUE-PROCESS RIGHT TO PRESENT A COMPLETE DEFENSE.

POINT IIDEFENDANT'S STATEMENTS AT THE EMERGENCY ROOM AND THE INTENSIVE CARE UNIT SHOULD HAVE BEEN SUPPRESSED BECAUSE THEY WERE OBTAINED IN VIOLATION OF THE FIFTH AMENDMENT RIGHT TO SILENCE SINCE NO MIRANDA WARNINGS WERE GIVEN.

POINT IIITHE COURT'S INSTRUCTIONS IN DEFINING THE DISTINCTION BETWEEN RECKLESS *334 MANSLAUGHTER AND DEATH BY AUTO ERRONEOUSLY PERMITTED THE JURY TO UTILIZE DEFENDANT'S INTOXICATION AS AN INDEPENDENT ACT OF RECKLESSNESS THAT COULD ELEVATE THIS OFFENSE FROM DEATH BY AUTO TO RECKLESS MANSLAUGHTER, THUS DEPRIVING DEFENDANT OF HER RIGHT TO A FAIR TRIAL. (Not Raised Below.)

POINT IVTHE SEVEN YEAR TERM IMPOSED IN THIS CASE WAS MANIFESTLY EXCESSIVE AND WARRANTS REDUCTION.

I.
Defendant contends that the trial judge erred in precluding defendant from testifying as to certain hypnotically-enhanced memories to support the defense theory that her car was bumped by the other Mustang driven by Cobb, which caused her to lose control and cross into the southbound lane and collide with Madera's vehicle. After a hearing pursuant to State v. Hurd, 86 N.J. 525, 432 A.2d 86 (1981), the trial judge restricted defendant's testimony to matters she could prove she recalled prior to being hypnotized, thereby precluding testimony as to alleged memories elicited as a result of hypnosis.
At the Hurd hearing defendant called Dr. Samuel Babcock, a clinical psychologist, who testified that defendant came to his office on June 8, 1995, accompanied by defense investigator Kauffman in the hope of obtaining a hypnotic refreshment of defendant's memory regarding the details of the accident. Dr. Babcock indicated that his initial objective was to determine whether this was an appropriate case of hypnotic refreshment. To that end, he first spoke with Kauffman in a recorded conversation to obtain background. Kauffman told him that defendant's memory of the events before the crash were "very vague."
Dr. Babcock then spoke privately with defendant for about twenty minutes in a recorded conversation, confining himself to inquiries about the accident. He did not probe the nature of defendant's injuries, was unfamiliar with her medical records and did not speak with defendant's psychologist even though he conceded that the personal psychologist's opinion as to whether defendant had blocked out memories because of trauma would have been relevant. He maintained that he was able to get sufficient insight as to whether defendant suffered from traumatic obstruction of memory of the incident from conversing with defendant notwithstanding the fact that defendant had a natural motivation to fabricate information.
At the outset of his conversation with defendant, Dr. Babcock underscored that his inquiry was relevant to her defense by specifically advising defendant that her attorney would get a copy of the tape of the hypnosis session and that he could "do whatever he wants to do with it. He can throw it in the trash or give it to the judge, it['s] his prerogative."
Dr. Babcock testified that defendant was able to tell him when she left work, where she went, the time she left Sabatini's and where she was headed. However, he determined that defendant's recollection closer to the time of the accident was confused and vague. He ruled out certain possible causes for this confusion, such as alcohol and head injury, because of the small amount of alcohol consumed by defendant and the relatively minor nature of her head injuries. Later he acknowledged that her statements about the amount of alcohol consumed was inaccurate in light of her blood alcohol concentration.
After his initial conversation, Dr. Babcock concluded that defendant suffered from traumatic memory loss and that she was, therefore, an appropriate candidate for hypnotic refreshment. He proceeded to hypnotize defendant and observed her during the twenty to thirty minute hypnotic *335 induction period to conclude that she was hypnotizable.
The hypnotic interview lasted thirty to forty minutes, during which Dr. Babcock and defendant engaged in the following colloquy:
Bobbi: He was like right behind me then he, it was like his lights went off. And I'm trying to get control. All's I notice is I'm trying to get control, and now is [sic] was like beside me.
Dr. Babcock: Did you see him, or did you just feel him?
Bobbi: It was like he was on, he was behind me, like I fishtailed, and I tried to regain back control of my car, and he was, wouldn't let me in.
Dr. Babcock: Did you see him beside you?
Bobbi: There was like a car there!
Dr. Babcock: Beside you?
Bobbi: Yes! It was like I was trying to gain control of my car.
Dr. Babcock: Could you see what color that car was?
Bobbi: No. Then I hit a car.
Dr. Babcock: You have no idea who this other car was or who owned it?
Bobbi: No. A couple of cars followed me before. I never said nothing to nobody, what do they want with me for? That was it?
Dr. Babcock: Do you recognize this car as ever following you before?
Bobbi: Not that I remember, no.
Dr. Babcock: Okay. So as you say, you lost control of the car, it started fishtailing, you did see that car again, beside you?
Bobbi: It was a car, I don't know, I never saw the car behind me, I don't know what make or nothing it was.
Dr. Babcock: So he was tight behind you, then as you were fishtailing, you feel that he pulled up along side of you?
Bobbi: Yes.
Dr. Babcock: On which side, right or left?
Bobbi: On my right side.
Dr. Babcock: And you couldn't get back in the other lane?
Bobbi: No.
Dr. Babcock: Okay. Alright I understand. And all this time he was, was this the first time he pulled up along side of you?
Bobbi: Yeah. He was behind me.
Dr. Babcock: Right. He never pulled up beside you before this?
Bobbi: Yeah. It was like I was pushed. I don't know how I lost control of the car.
Dr. Babcock: Okay.
Bobbi: And then, I'm fishtailing, and I'm trying to gain control, and it's like I'm tryin', it's like there was a car beside me and headlights in front of me.
Dr. Babcock: Okay. And when he was following you, how close do you think he was to the back of your car. What was your best guess?
Bobbi: When?
Dr. Babcock: As you were coming up towards that curve.
Bobbi: Right up my butt.
Dr. Babcock: Like how far would you say that was?
Bobbi: Maybe on top of it.
Dr. Babcock: Was he 50 feet away or just inches?
Bobbi: Inches.
Dr. Babcock maintained that as he restored defendant's memory, he tried to be neutral and not to lead her in any way, explaining that suggestion occurs when new information is injected into the proceedings as opposed to when a hypnotist merely repeats back what the subject has said to him. He admitted that he was mildly suggestive when he asked defendant whether the other driver was fifty feet or just inches away, but claimed that his question gave her the option of choosing any distance in between. He also agreed that he was suggestive when he *336 asked defendant if she learned "later" that the other car had been a Mustang and that he had been "negatively suggestive" when he asked whether the other car ever pulled up alongside her. He further admitted that when he mentioned that the tape of the hypnosis session could be used to defendant's benefit in court, he may have created a situation in which defendant had a motive to fabricate.
Babcock testified that he chose not to videotape the session because he believed that videotaping makes the subject more apprehensive and because he did not think there was any need for the hypnotist to appear on tape. He also pointed out that there was no way defendant could have received any visual cues from him since he was seated behind her head and her eyes were shut. Babcock confirmed that no one else was present in the room.
In Hurd, the Supreme Court identified several factors of "the hypnotic experience" which could render suspect the accuracy of the supposedly restored memory, including the subject's: (1) loss of critical judgment while under hypnosis; (2) the tendency to "confabulate" or confound newly-evoked memories with those of original recollection; and (3) the vulnerability to suggestion while under hypnosis. Hurd, supra, 86 N.J. at 539-40, 432 A.2d 86. As to this last feature, the Court observed that:
In describing the events he is reliving, [the subject] will tend to shape his "recall" in response to intentional or inadvertent cues from the questioner. These cues may be as obvious as leading questions or as subtle as the inflection of the questioner's voice or degree of apparent approval by the hypnotist. In addition, a subject often will incorporate into his response his notion of what is expected of him. Authorities note that there are particular problems of suggestibility when the subject is aware of a preferred response or when the examiner has a preconceived theory that is likely to influence his questioning. Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues.
[Id. at 539, 432 A.2d 86 (citations omitted).]
However, despite these shortcomings, the Hurd Court ruled that hypnotically enhanced testimony is admissible in a criminal trial provided the trial judge concludes that "the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." Id. at 543, 432 A.2d 86. In order to make this admissibility determination, there must be an evaluation based on expert testimony of both the kind of memory loss which was purportedly restored through hypnosis and the specific techniques employed by the hypnotist in order to determine whether "the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory." Ibid.
With regard to the type of memory loss involved, the Court noted that hypnosis is not appropriate in all instances of memory loss. Id. at 544, 432 A.2d 86. That is, while hypnosis is often reasonably reliable when dealing with memory loss stemming from a pathological reason, such as a traumatic neurosis, "the likelihood of obtaining reasonably accurate recall diminishes if hypnosis is used simply to refresh a witness' memory concerning details where there may be no recollection at all or to `verify' one of several conflicting accounts given by a witness." Ibid. Consideration need also be given to whether the subject has any discernible motivation for creating "self-serving fantasy."
Assuming that hypnosis is appropriate under the circumstances, the trial judge is obliged to evaluate the reliability of the hypnotic procedures used. Hurd stressed the necessity of considering the "manner of questioning and the presence of cues or *337 suggestions during the trance and the post-hypnotic period," as well as the amenability of the subject to hypnosis in view of the increased suggestibility of subjects capable of entering deeper trances. Ibid.
Therefore, to provide an adequate record for this reliability inquiry, and also to ensure a minimum level of reliability, Hurd adopted the following mandatory procedural requirements governing the conduct of hypnosis sessions: (1) the hypnosis session must be carried out by an experienced psychiatrist or psychologist who qualifies as an expert; (2) the hypnotist must be independent of and not regularly employed by either the State or the defense; (3) any information given to the hypnotist by any party prior to the hypnosis session must be recorded, either in writing or another suitable form; (4) before inducing hypnosis, the hypnotist should elicit from the subject a detailed description of the facts as remembered at that point in time; (5) all contacts between the hypnotist and the subject must be recorded, including the pre-hypnosis interview, the hypnosis session and the posthypnotic period; and (6) the hypnotist should be alone with the subject during the pre-induction interview, the hypnosis session and the post-hypnotic period. Id. at 545-46, 432 A.2d 86. The Hurd court specifically noted that "[t]he hypnotist should carefully avoid influencing the description by asking structured questions or adding new details." Id. at 546, 432 A.2d 86. The court also "strongly encouraged" videotaping the actual hypnosis session in order to record any visual cues. Ibid.
The party seeking to introduce hypnotically refreshed testimony has the burden of establishing admissibility by clear and convincing evidence. Ibid. See also, State v. L.K., 244 N.J.Super. 261, 582 A.2d 297 (App.Div.1990) (applying Hurd guidelines to defense applications in criminal cases).
We agree with the determination of the trial judge that the proofs adduced by the defendant did not meet the standard of suitability for hypnotically-refreshed testimony. Dr. Babcock did nothing to ascertain the actuality of defendant's memory loss beyond a general inquiry of Investigator Kauffman and reliance upon his response that defendant's memory of the accident was "vague." The transcript of the pre-hypnotic session with defendant also does not evidence memory loss to meet the Hurd standard.
By failing to familiarize himself with defendant's prior statements about the incident, Dr. Babcock did not adequately consider the extent of defendant's memory with regard to the issue of whether traumatic blockage was the efficient cause of her alleged memory loss. By electing not to review medical records or interview treating physicians, Dr. Babcock's diagnosis of continuing post-traumatic stress disorder is speculative and based on incomplete information. Moreover, Dr. Babcock's comments to defendant regarding the potential use of the tape of the hypnotic session increased the possibility of defendant creating a self-serving scenario during the hypnotic session and his conduct of the hypnotic interview was suggestive as reinforcing information previously provided by the defendant in a speculative or tentative fashion. See State v. Fertig, 143 N.J. 115, 121, 668 A.2d 1076 (1996)[1].
Therefore, we affirm the finding that the defendant did not meet the burden of showing that the situation was appropriate for hypnotic memory enhancement, and we conclude that the trial judge properly precluded the use of the hypnotically-refreshed memories.

II.
Defendant contends that the trial judge erred in failing to suppress the statements *338 made by her without the benefit of Miranda[2] warnings while in the emergency room after the accident and in the intensive care unit after her surgery, claiming that the statements were elicited under circumstances which amounted to custodial interrogation. We disagree.
Miranda warnings are constitutionally mandated when a suspect is subjected to custodial interrogation by law enforcement officers. Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-07 (1966). It is custodial interrogation and not the mere focus upon a particular subject which implicates the requirement that Miranda warnings be given. State v. Graves, 60 N.J. 441, 448, 291 A.2d 2 (1972); State v. Coburn, 221 N.J.Super. 586, 595, 535 A.2d 531 (App.Div.1987), certif. denied, 110 N.J. 300, 540 A.2d 1281 (1988). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-07. Accord Stansbury v. California, supra, 511 U.S. at 321, 114 S.Ct. at 1528, 128 L.Ed.2d at 298; State v. Keating, 277 N.J.Super. 141, 144, 649 A.2d 103 (App.Div.1994). In determining whether a custodial interrogation has occurred, a court must examine all of the circumstances surrounding the interrogation. Stansbury, supra, 511 U.S. at 320-21, 114 S.Ct. at 1528-29, 128 L.Ed.2d at 298; State v. O'Loughlin, 270 N.J.Super. 472, 477, 637 A.2d 553 (App.Div.1994); State v. Coburn, supra, 221 N.J.Super. at 596,535 A.2d 531.
Custody will be found "if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he could not leave freely." O'Loughlin, supra, 270 N.J.Super. at 477, 637 A.2d 553 (quoting State v. Coburn, supra, 221 N.J.Super. at 596, 535 A.2d 531). A court may consider on a case-bycase basis attendant circumstances such as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances. State v. Pierson, 223 N.J.Super. 62, 67, 537 A.2d 1340 (App.Div.1988); State v. Cunningham, 153 N.J.Super. 350, 353, 379 A.2d 860 (App.Div.1977).
Defendant contends that the police questioning which occurred in the hospital, first by Davey and then by Taggart, cannot be considered anything other than custodial because it took place when defendant was in the hospital suffering from injuries and it occurred after both Davey and Taggart were in possession of sufficient evidence rendering defendant a suspect in a vehicular homicide.
A hospital room generally lacks the "compelling atmosphere inherent in the process of in-custody interrogation." State v. Zucconi, 50 N.J. 361, 364, 235 A.2d 193 (1967) (quoting from Miranda v. State of Arizona, supra, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726). See also State v. Figueroa, 212 N.J.Super. 343, 349-50, 515 A.2d 242 (App.Div.1986) (admission of statements made by defendant while in hospital bed deemed appropriate where there was no "overbearing or over-reaching" during the interrogation, the statements were made voluntarily and the statements appeared to be reliable and trustworthy in light of the other evidence in the case), certif. denied, 107 N.J. 142, 526 A.2d 204 (1987).
Other jurisdictions have similarly concluded that the fact that an individual is hospitalized and unable to leave due to disabling injuries when questioned by the police does not warrant the automatic administration of the Miranda warnings in the absence of other indicia of custody. See State v. Cooper, 119 Idaho 654, 809 P.2d 515 (1991) (in-hospital interview of *339 defendant by police was not custodial in nature where defendant had been taken by ambulance, and not police car, to hospital and was being released at time of interview); People v. Goyer, 265 Ill.App.3d 160, 202 Ill.Dec. 744, 638 N.E.2d 390, 395 (1994) (defendant who was hospitalized when interviewed by police failed to demonstrate custody where interview lasted less than one hour and defendant was in no way physically restrained); Cummings v. State, 27 Md.App. 361, 341 A.2d 294, 302-05 (1975) (in-hospital interview of defendant by police was not custodial in nature where others were present during the interrogation, no formal arrest was made, defendant was not physically restrained, and interview was not lengthy); State v. Melton, 239 Neb. 506, 476 N.W.2d 842, 845 (1991) (in-hospital interview of defendant was not custodial in nature where defendant had not been placed under formal arrest); State v. Sweatt, 333 N.C. 407, 427 S.E.2d 112, 118 (1993) (fact that defendant was in hospital because of his own actions, absence of posted guard outside of defendant's door, and lack of any overt actions by police officers indicated that defendant was not in custody when interviewed by police at hospital); State v. Schambow, 176 Wis.2d 286, 500 N.W.2d 362, 365, review denied, 505 N.W.2d 139 (1993) (in-hospital interview of defendant by police was not custodial in nature where police asked for permission to speak to defendant, numerous other people were present at the time of the interview, the interview was short in duration, there was no evidence of trickery or pressure, the limits on defendant's freedom had not been created by the police and defendant had not been placed under arrest and was demonstrably lucid at the time).
Defendant's reliance on State v. O'Loughlin, 270 N.J.Super. 472, 637 A.2d 553 (App.Div.1994) is misplaced. In O'Loughlin, defendant and her passenger were transported by ambulance to Harlem Hospital in New York City after being involved in a fatal automobile accident. Soon thereafter, a Port Authority police officer arrived, purportedly to prepare an "aided report" regarding defendant's medical condition. The officer prevented defendant from leaving the hospital with her visibly intoxicated companion or another friend to seek treatment elsewhere indicating that defendant was "under ... [their] care" and would have to wait for policearranged transportation.
Another officer soon arrived to relieve the original officer and offered to drive defendant to a nearby taxi stand where she could get a taxi to Englewood hospital. This officer insisted upon inspecting the contents of defendant's purse before allowing her to enter his car. The original responding officer then followed the car containing defendant to the taxi stand before leaving the scene. The driver of the cab which they eventually secured was told by the relieving officer that his fare would be paid by the Port Authority and that he should not "lose" defendant. The officer followed the cab to the hospital where he remained until he was relieved by two new officers. These officers then proceeded to interview defendant while she was sitting on a gurney after apparently ordering her friend to leave. The interview lasted approximately ten or fifteen minutes, and at no point was defendant formally arrested.
In assessing whether or not defendant had been in custody when questioned by the police, we noted that after the accident, defendant was under "continuous police supervision" for nearly three hours before being interrogated. We observed that during this lengthy time period the officers failed to complete any "aided report" or obtain any other accident information from defendant. Id. at 484, 637 A.2d 553. Additionally, the officers permitted defendant's passenger to leave, thereby singling defendant out for special treatment. We found that a reasonable person in defendant's circumstances would have believed that he or she was not free to leave and that the State had failed to "offer any legitimate justification as to an *340 asserted need to gather medical information simultaneously with the administration of ... medical treatment by a hospital to an injured accident victim." Id. at 488, 637 A.2d 553.
O'Loughlin is clearly distinguishable from the present cases. Here defendant was not physically detained nor subjected to continuous police supervision for a substantial period of time prior to giving her statements. Rather, the circumstances surrounding the taking of both statements indicate that she was not in custody. The police requested permission to speak to defendant on both occasions. No guards were posted outside the door of her hospital room, nor was she formally arrested. Others were permitted to be present during the interviews, and there was no overbearing police conduct. We conclude that the questioning of defendant both in the emergency room and the intensive care unit did not constitute custodial interrogation and that her statements were properly admitted despite the absence of Miranda warnings.

III.
Defendant next argues that the trial judge's reinstruction to the jury in response to a question relating to the differences between the charges of reckless manslaughter and death by auto constituted reversible error. Since no objection was made, the plain error standard must be met. R. 2:10-2; State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
The crime of reckless manslaughter is based on N.J.S.A. 2C:11-4b(1), which provides that "[c]riminal homicide constitutes manslaughter when ... [i]t is committed recklessly." Ibid. To determine whether the death of Madera was a homicide, the jury had to find that defendant operated her vehicle recklessly by consciously disregarding a substantial and unjustifiable risk that death would result from her conduct. N.J.S.A. 2C:2-2(b)(3); State v. Bowens, 205 N.J.Super. 548, 553, 501 A.2d 577 (App.Div.1985), aff'd, 108 N.J. 622, 532 A.2d 215 (1987). Since the death was caused by a motor vehicle, the jury also had for its consideration the "death by auto" statute as a lesser-included offense. N.J.S.A. 2C:11-5(d).
The mental element of "recklessness" required for manslaughter is greater than that required for death by auto. That is, the State must prove beyond a reasonable doubt "causative acts of recklessness that are different in kind from the acts involved in reckless driving that support a conviction for death by auto." State v. Jamerson, 153 N.J. 318, 334, 708 A.2d 1183 (1998); State v. Jiminez, 257 N.J.Super. 567, 584, 608 A.2d 996 (App.Div.1992).
While driving under the influence may alone satisfy the recklessness required by the death by auto statute, Jamerson, supra, at 334, 708 A.2d 1183; State v. LaBrutto, 114 N.J. 187, 204, 553 A.2d 335 (1989), more is required for reckless manslaughter. When the State relies on the extent of drinking as an additional act constituting recklessness which caused death, the drinking must "be more than casual drinking and more than mere intoxication, rather, it would have to be exceptional drinking to a marked extent." See, e.g., State v. Scher, 278 N.J.Super. 249, 269, 650 A.2d 1012 (App.Div.1994), certif. denied, 140 N.J. 276, 658 A.2d 299 (1995). The conduct while driving or prior to driving must be "so extraordinary and extreme as to satisfy the reckless manslaughter standard." Scher, supra, 278 N.J.Super. at 269, 650 A.2d 1012. The deviation from reasonable care must be gross so to satisfy the element of recklessness in a reckless manslaughter case.
In the instant case, the trial judge properly instructed the jury that a determination of reckless manslaughter required the jury to find an additional act of recklessness beyond the reckless driving itself:
Let me try to differentiate for you the difference between the manslaughter *341 counts and death by auto statute. Standing alone the reckless driving of an automobile, which results in the death of another, satisfies all of the requirements for violation of the death by auto statute provided, of course, that you are so convinced beyond a reasonable doubt.
Now, a reckless manslaughter, and that's the middle one, that's the one step up from death by auto, a reckless manslaughter conviction on the other hand must be based upon proof beyond a reasonable doubt that the Defendant engaged in an additional act or acts of recklessness beyond the mere driving of an automobile in a reckless manner and that such act or acts were also a cause of the victim's death. Such causative acts of recklessness must be different in kind from, although not necessarily worse than, those involved in reckless driving. The additional act or acts of recklessness must be conduct of the Defendant in addition to the recklessness in her operation of the motor vehicle. The additional acts of recklessness may occur but need not occur at the same time of the reckless driving, but may precede the reckless driving. This is not to say that someone guilty of reckless manslaughter may not have been driving recklessly as well.
So as to satisfy the requirements of death by auto, but to find a person ... guilty of reckless manslaughter where an automobile is involved, there must be acts of recklessness separate and apart from and in addition to the manner in driving and these acts must have been a cause of the victim's death.
After deliberations commenced the jury submitted a request for reinstruction on the elements of each charge. The trial judge stated the following:
Now, having said all that, I will again attempt to differentiate between the aggravated manslaughter, reckless manslaughter and death by auto. Standing alone the reckless driving of an automobile, which results in the death of another, satisfies all of the requirements for violation of the death by auto statute provided that you are so convinced of those elements beyond a reasonable doubt.
A reckless manslaughter, that's the second one now, a reckless manslaughter conviction on the other hand must be based upon proof beyond a reasonable doubt that the Defendant engaged in an additional act or acts of recklessness beyond the mere driving of an automobile in a reckless manner and that such act or acts were also a cause of the victim's death. Such causative acts of recklessness must be different in kind from, although not necessarily worse than, those involved in reckless driving. The additional act or acts of recklessness must be conduct of the Defendant in addition to the recklessness in her operation of the motor vehicle. The additional acts of recklessness may occur but need not occur at the same time of the reckless driving, but may precede the reckless driving.
In this case, the State has argued that the Defendant's consumption of alcohol before driving is an additional act of recklessness. This is not to say that someone guilty of reckless manslaughter may not have been driving recklessly as well. So as to satisfy the requirements of death by auto, but to find a person guilty of reckless manslaughter where an automobile is involved, there must be acts of recklessness separate and apart from and in addition to the manner of driving and these acts must have been a cause of the person's death.
No objection was made to this recharge. Thereafter the jury made an addition request to be reinstructed on the definition of "recklessness." Rather than reciting the definition again, the trial judge elected over the State's objection to provide the jury with a chart blowup of the definition prepared by the defense and used as a visual aid by the defense in opening statement.
*342 Defendant argues that the reinstruction was reversible plain error because the jury should have been told that "mere intoxication" would not suffice and that the defendant's drinking must have been extreme and exceptional. However this case is not one in which the only enhancement of recklessness rested upon the consumption of alcohol. The jury could well have found that defendant was racing with another car at grossly excessive speed on a two-lane State highway while passing other vehicles and going around blind curves. In our view, such a degree of reckless operation taken together with the consumption of alcohol constitutes a sufficient basis to support the conviction for reckless manslaughter in this case. Accordingly, we find that the jury charge and re-charge fairly conveyed the law and that in any event there was no plain error or error sufficient to adversely affect the substantial rights of the defendant.

IV.
Finally, we find no basis to upset the imposition of the presumptive seven year sentence. The sentencing judge properly considered and weighed the applicable aggravating and mitigating factors, including the defendant's physical injuries resulting from the accident. There was no clear error of judgment to shock the judicial conscience. State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); State v. Roth, 95 N.J. 334, 363-65, 471 A.2d 370 (1984).
Affirmed.
NOTES
[1] We note that in State v. Fertig, the Supreme Court found substantial and credible evidence supported the trial judge's findings that Dr. Babcock's questioning was "highly suggestive" and that he violated the Hurd guidelines. Id. at 123, 668 A.2d 1076.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).