**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2311-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY J. CASTILLO, a/k/a
ANTHONY JAVIER MEDINA
CASTILLO,

    Defendant-Appellant.

_____

Submitted December 3, 2024 – Decided January 17, 2025

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 20-09-0048.

Scott D. Finckenauer, attorney for appellant.

Matthew J. Platkin, Attorney General, attorney for respondent (Debra G. Simms, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Anthony J. Castillo of second-degree conspiracy to distribute heroin in a quantity of five ounces or more, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(1), and N.J.S.A. 2C:5-2; and third-degree possession of a controlled substance, N.J.S.A. 2C:35-10(a)(1). The jury acquitted defendant of first-degree possession with intent to distribute heroin in a quantity of five ounces or more, N.J.S.A. 2C:35-5(a)(1). Defendant was sentenced to six years imprisonment for the conspiracy to distribute heroin conviction. Defendant's conviction for the third-degree possession of a controlled substance was merged into the conviction for the conspiracy charge for purposes of sentencing.

Defendant appeals his judgment of conviction arguing that: (1) the State failed to prove the charges against him beyond a reasonable doubt; and (2) the trial court erred in admitting defendant's statement at trial. We affirm defendant's convictions.

I.

We discern the facts from the record, both at the pre-trial suppression hearing and at trial. In December 2017, law enforcement was conducting a drug trafficking investigation in the City of Paterson. The target of the investigation was an individual named Ami Edwards. An undercover detective,

testifying anonymously,[1] recounted that he made an undercover purchase on January 19, 2018 from Edwards and arranged another for February 2018.

The detective and Edwards met again and discussed another narcotics purchase. Edwards agreed to make the deal and they arranged the purchase for February 8, 2018.

On February 8, 2018, Edwards arrived at the Bonfire, a local restaurant, driving a Cadillac. He called the detective to let him know he was waiting for someone to arrive. The detective believed Edwards was waiting for his supplier. Moments later, Edwards called the detective and asked him to come to his car. When the detective arrived at Edwards' car, he handed the detective a brown box containing 200 bricks of heroin out of a blue laundry bag. The detective left, signaling to the "take-down team" that an arrest could be made. Edwards was thereafter arrested.

The detective noticed another vehicle, an Acura, arriving at the Bonfire that day, but had no information as to this vehicle or its occupants. Lieutenant Michael Giampietro, an officer with the Cliffside Park Police Department, was involved in the drug trafficking investigation with Edwards. Giampietro was at the Bonfire on February 8, 2018, and during the transaction, saw an Acura arrive

---

[1] Defendant consented to the detective testifying anonymously at trial.

A-2311-22

at the restaurant. Giampietro testified that he observed Edwards enter the Acura empty handed and exit the car carrying a blue laundry bag, which appeared to be "squared off" and "weighted." The Acura was driven by another individual, Ami Fernandez, defendant's pregnant girlfriend. Defendant was seated in the passenger seat.

Edwards returned to the Cadillac with the bag and the undercover detective entered the Cadillac. Defendant, Edwards, and Fernandez were arrested at the scene and taken to the State Police Barracks in Totowa. The blue laundry bag, containing a brown shoe box with 200 bricks of heroin, was seized and secured. It was later submitted to a lab for testing.

After being taken into custody, defendant was advised of his Miranda[2] rights twice and acknowledged those warnings by signing two Miranda cards: one at 5:20 p.m. and the other at 6:56 p.m., on February 8, 2018. Defendant waived his rights and gave a recorded statement to the officers.[3] Because defendant's primary language was Spanish and the interview was conducted by Giampietro, who did not speak Spanish, communication between defendant and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Defendant's video-recorded interview is not contained in the record.

law enforcement occurred through Detective Christopher Rios, who is fluent in Spanish.

Defendant stated that earlier that day on February 8, 2018, he received a call from an individual he only knew as a "black man," later identified as Edwards, asking him to pick up 200 bricks of heroin. Defendant explained that he took a bus to Manhattan to pick up the drugs and returned by bus to New Jersey. The drugs were in a box, and when defendant returned home, he placed the box in a bag. While he was arranging for a taxi to take him to the Bonfire, defendant stated that his girlfriend, Fernandez, agreed to drive him to the restaurant. Defendant stated Fernandez was unaware of what he was doing.

Defendant stated that he was short on money and expected to receive $60.00 per brick, although he did not receive payment for the drugs. Defendant stated that this was his second time delivering drugs and the first time he was arrested.

Defendant admitted he met Edwards at the Bonfire, which was prearranged, was driven there by Fernandez, and gave the drugs to Edwards. He repeatedly stated that Fernandez was unaware that drugs were in the blue laundry bag and that she was not involved in the matter.

A.  Motion to Admit/Suppress Defendant's Statement.

Defendant moved to suppress the statement he gave to law enforcement on the day of his arrest, while the State moved to admit the statement at trial. The court conducted a Miranda hearing to determine whether defendant's statement would be admitted at trial. Detective Rios testified on behalf of the State. Defendant did not testify on his own behalf and called no witnesses.

Detective Rios testified that on February 8, 2018, he was involved in the investigation that led to the arrests of defendant, Fernandez, and co-defendant Edwards at approximately 3:30 p.m. to 4:00 p.m. Rios testified that he was not present when defendant signed the first Miranda card, but no statement was taken from him at that time. Rios testified that he advised defendant of his Miranda rights before taking his statement, and defendant acknowledged understanding his rights. Defendant then signed the second Miranda card before he gave his statement. He told Rios he wished to speak with the officers. According to Rios, defendant did not appear to be under the influence of any drugs or alcohol and no threats, coercion or force were used to compel defendant's statement. Further, defendant agreed that no promises or threats were made to him. Defendant was given the opportunity to ask questions, and he had none.

A-2311-22

Defendant's statement was video-recorded and lasted approximately thirty minutes. A transcript of the interview was created and reviewed by Rios for accuracy. Rios testified that the video recording captured defendant's entire statement. The interview was conducted in English and Spanish.

Following the hearing, the court advised that it intended to admit defendant's statements into evidence at trial and would supplement its decision the following day. In its supplemental decision, the court found Detective Rios' testimony credible and began the analysis by noting that there was no question that defendant was in custody. The court found that defendant was advised twice of his Miranda rights. The court determined that defendant read and understood those rights and signed two Miranda cards acknowledging those rights. The court also found that defendant "knew why he was being questioned." The court concluded that there was no prior questioning of defendant before he was administered his Miranda rights.

During the interview, the court found that neither Rios nor Giampietro "ever raised their voices, threatened, coerced or otherwise intimidated . . . defendant." The court further found that defendant was not subjected to "mental exhaustion, physical stress" nor was defendant's will overborne in any fashion.

The court found that defendant, who was then twenty-eight years of age, with some college education, was able to read, write, and understand the Spanish language. He was not under the influence at that time of the interview.

In reviewing the totality of the circumstances surrounding defendant's custodial interrogation, the court found, the State met its burden, beyond a reasonable doubt, that defendant knowingly, intelligently and voluntarily waived his <u>Miranda</u> rights. Thus, the court granted the State's motion to admit defendant's statement and conversely, denied defendant's motion to suppress.

B. Trial.

Dawn Klarin, a forensic scientist with the Department of Law and Public Safety's Office of Forensic Sciences, testified, without objection, as an expert in the field of drug analysis. Klarin testified that the evidence seized in defendant's case was submitted to the lab for analysis. She explained that there were 1,001 bundles of suspected narcotics submitted to the lab for analysis. Based upon Klarin's analysis, she determined the bundles contained 146.92 grams of heroin in 9,979 glassines, with an uncertainty of 0.74 grams.

Klarin explained that rather than test every single glassine individually, she used a scientifically accepted extrapolation method called hypergeometric sampling to determine the net weight of the drugs. This method involves

weighing a sample of twenty-nine glassines and using statistical methods to extrapolate the weight of the entire amount.

The State played the video recording of defendant's statement at trial. The undercover detective, Giampietro, and Rios testified on behalf of the State.

Defendant, Fernandez, and Patricia Rojas, Fernandez's mother, also testified at trial as defense witnesses, offering an alternative version of events from that offered by defendant in his statement to law enforcement. Defendant and Fernandez testified that on the day of their arrests, they woke up at their apartment in Paterson and decided to visit Rojas's home also located in Paterson, where other family members resided. At the time of their visit, Rojas' boyfriend Franklin Tervares was at Rojas' home. While at Rojas' house, Fernandez, who was nine months pregnant, told defendant she was having contractions and was not feeling well, and wanted to go to the hospital. Before leaving, Tervares asked them if they could do him a favor on the way to the hospital by dropping a bag off at the Bonfire restaurant. Defendant and Fernandez agreed and testified they believed the bag contained clothing.

Defendant additionally testified at trial to an alternative version of events from his recorded statement. Defendant testified he was taken to a room at the police station and asked to sign a card, which he did. Rios then spoke to him in

A-2311-22

Spanish and told him he needed to take responsibility for the drugs or his wife would stay in jail and his daughter would be born in prison. Defendant then said he wanted to make a call and that he wanted a lawyer, and that Rios responded that he needed to decide as to whether he would take responsibility or let his wife give birth in jail.

Defendant then testified that what he said in his recorded statement was not the truth and that he only said what Rios told him to say because he promised to help him and release Fernandez if he admitted his involvement. Defendant testified that he did not go by bus to and from Manhattan to pick up drugs.

The State recalled Rios as a rebuttal witness, who contradicted defendant's testimony regarding his custodial interview. Rios testified there was no pre-interview conducted with defendant prior to him giving his recorded statement. Rios denied defendant was fed information about the case. Rios testified that he avoided asking leading questions and instead asked open-ended questions to give defendant the opportunity to tell his story, and the drug terminology used by defendant was his own words. Rios also reiterated that while he filled out the second Miranda card pertaining to this case, he was not involved in defendant signing the first card.

Rios testified he had no knowledge of anything that may have occurred from the time of defendant's arrest until the time the detective interacted with defendant prior to the taking of his statement, including the hour and thirty-minute gap between the time defendant signed the first <u>Miranda</u> card and the time he signed the second card.

Defendant now appeals from his convictions.

II.

On appeal, defendant presents the following two arguments for our consideration:

> POINT I: THE STATE FAILED AT TRIAL TO PROVE THE CHARGES AGAINST DEFENDANT-APPELLANT BEYOND A REASONABLE DOUBT.

> POINT II: THE TRIAL COURT ERRED IN ADMITTING DEFENDANT-APPELLANT['])S STATEMENT AT TRIAL.

<u>A. Jury's Verdict Against the Weight of the Evidence</u>.

Defendant contends that the jury's verdict was against the weight of the evidence because the State failed to prove beyond a reasonable doubt the weight of the drugs alleged to have been possessed by defendant. Defendant argues there "was no evidence that the hypergeometric method [used by the State's expert] was scientifically reliable or accepted." Defendant notes that only

11

twenty-nine or 0.29% of 9,979 glassines were tested, a sample size "clearly insufficient for purposes of extrapolating the total weight of the drugs."

"We do not consider a weight-of-the-evidence argument on appeal unless the appellant moved in the trial court for a new trial on that ground." State v. Fierro, 438 N.J. Super. 517, 530 (App. Div. 2015); see R. 2:10-1. Here, following the jury's verdict, defense counsel stated that he may want to file a motion prior to sentencing to address the perceived "inconsistency" in the jury's verdicts. While the court stated that it was not prejudging any such motion, the "instructions that were given to the jury and the law is quite clear." Therefore, the court denied defendant's motion.

The record does not clearly support that defense counsel affirmatively moved for a new trial. However, in light of the colloquy and in the interest of justice, we can and do consider the merits of defendant's argument. State v. Smith, 262 N.J. Super. 487, 511 (App. Div. 1993) ("[T]he issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." (quoting R. 2:10-1)).

"In considering whether a jury verdict was against the weight of the evidence, our task is to decide whether 'it clearly appears that there was a

miscarriage of justice under the law.'" Smith, 262 N.J. Super. at 512 (quoting R. 2:10-1). "We must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)). "But an appellate court may not overturn the verdict 'merely because it might have found otherwise upon the same evidence.'" Ibid. (quoting State v. Johnson, 203 N.J. Super. 127, 134 (App. Div. 1985)).

"On a motion for a new trial, the objective is not to second-guess the jury but to correct [an] injustice that would result from an obvious jury error." State v. Saunders, 302 N.J. Super. 509, 524 (App. Div. 1997). Thus, "[a]ppellate intervention is warranted only to correct an 'injustice resulting from a plain and obvious failure of the jury to perform its function.'" Smith, 262 N.J. Super. at 512 (quoting Johnson, 203 N.J. Super. at 134).

A bedrock legal principal of our criminal justice jurisprudence is that the State must prove each element of a crime beyond a reasonable doubt. In re Winship, 397 U.S. 358, 363-64 (1970). The State acknowledges that the weight of a controlled dangerous substance is a material element of the offense. State v. Florez, 134 N.J. 570, 595 (1994).

Defendant was charged with and convicted of, among other crimes, second-degree conspiracy to distribute heroin in a quantity of five ounces or more, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(1), and N.J.S.A. 2C:5-2. N.J.S.A. 2C: 35-5(b)(1) requires the State to prove defendant possessed heroin in a quantity of five ounces or more. Defendant disputes only the weight of the drugs he was convicted of possessing. Specifically, he argues that the sample size of twenty-nine out of 9,979 glassines tested and weighed was insufficient for purposes of extrapolating the total weight of the drugs and for the expert's conclusion as to the total weight.

At trial, the State offered the testimony of Klarin, a forensic chemist in the State's forensic sciences lab. Defendant stipulated to the expert's qualifications and the court qualified Klarin as an expert in the field of drug analysis. Defendant offered no evidence, either expert testimony or otherwise, to counter or rebut Klarin's testimony.

Klarin explained the process she undertook to analyze the drugs, which included checking the operability of the instruments and having her results peer reviewed. Klarin further explained the hypergeometric sampling method, which is a statistical approach to determining the weight of the drugs. According to Klarin, this method is reliable and generally accepted in the scientific community.

14

Defendant argues the twenty-nine individual glassines tested are a small percentage of the larger total and seems to suggest that the expert needed to test every glassine to support his conviction. However, defendant did not present any rebuttal evidence; he did not offer the testimony of an expert to counter Klarin's testimony, nor did he offer evidence to discredit Klarin's analysis. His contentions are not supported by the record. Thus, defendant has not established there was a clear "miscarriage of justice under the law." Smith, 262 N.J. Super. at 512 (quoting R. 2:10-1).

B. Admission of Defendant's Statement at Trial.

Defendant contends the trial court erred in admitting his recorded interview because the police did not comply with Miranda. He also asserts the police conducted an unrecorded interview prior to conducting the taped interview, where he was pressured into taking responsibility for the crimes and given information as to what he should say during the interview. Therefore, defendant argues he did not voluntarily and knowingly waive his Miranda rights because the police made threatening statements regarding his girlfriend going to jail and giving birth in prison to pressure him into confessing, and he did not know the meaning of the card he signed. Finally, defendant contends the police ignored his request for an attorney.

15

In reviewing a court's denial of a motion to suppress, an appellate court "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Factual findings "should be overturned 'only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Boone, 232 N.J. 417, 426 (2017) (quoting Elders, 192 N.J. at 244) (internal quotation marks omitted). Legal interpretations are owed no deference and thus, are reviewed de novo. State v. Robinson, 228 N.J. 529, 543 (2017).

The right against self-incrimination is guaranteed by the Fifth Amendment of the United States Constitution and New Jersey law. See U.S. Const. amend. V; N.J.S.A. 2A:84A-19; N.J.R.E. 503. In State v. Clark, 251 N.J. 266 (2022), our Supreme Court articulated the principles governing a defendant's right against self-incrimination as follows:

> The Fifth Amendment of the United States Constitution, applicable to the States through the Fourteenth Amendment, see State in Int. of A.A., 240 N.J. 341, 351 (2020), guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V. Although not included in the New Jersey Constitution, the right against self-incrimination is deeply rooted in New Jersey common law and is codified by statute and the

> Rules of Evidence. See N.J.S.A. 2A:84A-19; N.J.R.E. 503.
>
> In Miranda v. Arizona, the United States Supreme Court held that individuals who are "subjected to police interrogation while in custody . . . or otherwise deprived of [their] freedom of action in any significant way" must be appropriately advised of certain rights so as to not offend the right against self-incrimination. 384 U.S. at 477-79. Miranda warnings include advice as to the right to remain silent and of the right to the presence of an attorney during any questioning. Id. at 479. Pursuant to Miranda, if an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74. Furthermore, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.
>
> [Clark, 251 N.J. at 291-92 (alterations and omissions in original).]

"The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384, 397 (2019). To admit a statement obtained during a custodial interrogation, "the State must 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" State v. Tillery, 238 N.J. 293, 316 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)); see also State v.

Nyhammer, 197 N.J. 383, 405 n.11 (2009) (emphasizing the totality of the circumstances analysis).

To determine whether a defendant's statements were voluntary, the court considers "the totality of the circumstances." A.M., 237 N.J. at 398. These include a defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Nyhammer, 197 N.J. at 402 (quoting Presha, 163 N.J. at 313) (internal citation and quotation marks omitted).

"A court may consider on a case-by-case basis attendant circumstances such as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police[,] and all other relevant circumstances." State v. Choinacki, 324 N.J. Super. 19, 44 (App. Div. 1999). An investigator's statements must not be "manipulative or coercive" because it could deprive a defendant of the "ability to make an unconstrained, autonomous decision to confess." State v. Di Frisco, 118 N.J. 253, 257 (1990) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)).

"Efforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese,

222 N.J. 525, 544 (2015) (quoting State v. Miller, 76 N.J. 392, 403 (1978)).  A false promise of leniency is not an inherently coercive lie.  State v. L.H., 239 N.J. 22, 44-45 (2019) (noting a false promise of lenience may be coercive if the lie, "under the totality of circumstances, ha[s] the capacity to overbear a [defendant's] will").

Here, after carefully reviewing the record, we are satisfied the court did not err in admitting defendant's recorded interview at trial.  To determine the admissibility of defendant's recorded interview, the court conducted a pre-trial hearing at which Rios testified on behalf of the State.  Defendant called no witnesses.  The court credited the testimony of Rios, finding his testimony "was wholly consistent on both direct and cross-examination and was not contradicted by any other evidence."  The court thus found Rios's testimony was "reasonable, inherently believable, and therefore credible."

The court noted defendant's signature appeared on two Miranda cards and the cards articulate the Miranda warnings in both English and Spanish.  The court also found that defendant appeared on the video reading aloud and acknowledging each right.  When asked by Rios if "knowing your rights, do you wish to speak with us?" defendant replied "yes."  The court found no evidence during the thirty-minute interview of the police pressuring or coercing defendant

to speak to the officers, and defendant had no difficulty understanding or communicating with the detective. The court considered defendant's personal characteristics, such as his age and educational background.

Based upon the totality of the circumstances, the court found, the State met its burden, beyond a reasonable doubt, that defendant knowingly, intelligently and voluntarily waived his Miranda rights and thus, the court granted the State's request to admit defendant's recorded interview. As a result of the court's decision, defendant's recorded interview was played for the jury.

In examining the totality of the circumstances, we are satisfied the evidence sufficiently supported the court's findings that defendant knew why he was arrested and being questioned. While defendant had not previously been arrested, his age, educational background, intellect, length of his detention and interview, demeanor during the interview and responses to the questioning counter defendant's assertion that he was pressured into making a statement. Further, the evidence did not demonstrate the officers subjected defendant to threats, mental exhaustion, or physical stress.

Defendant's assertion that he was pressured into waiving his Miranda rights to protect his girlfriend and unborn child from involvement in the criminal justice system is without support in the record. Moreover, "[u]nlike the use of

physical coercion, . . . use of a psychologically-oriented technique during questioning is not inherently coercive." State v. Galloway, 133 N.J. 631, 654-55 (1993) (citing Miller, 76 N.J. at 405). "The real issue" is whether defendant's decision to confess was a result of the officers "overbearing" defendant's will. Id. at 655. Other than defendant's assertion, the evidence does not support the contention that defendant's will was overborne, resulting in his confession.

In sum, based on the record before us, we are satisfied the court properly admitted defendant's statement at trial. Law enforcement adhered to defendant's constitutional protections before conducting the custodial interrogation. The court conducted an evidentiary hearing and made adequate findings of fact and conclusions of law pursuant to Rule 1:7-4. We are satisfied those findings are supported by competent and credible evidence in the record and discern no basis to reject the court's ruling on this issue.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2311-22